JOHN J. MARVIN, Appellant, *v.* JAMES I. BROOKS, Impleaded etc., Respondent.

Where an agent has been intrusted with his principal's money, to be expended for a specific purpose, the former may be required to account in equity; and upon such an accounting the burden is upon him, of showing that his trust duties have been performed, and the manner of their performance.

Defendant B. purchased certain securities under an agreement between him and plaintiff that the purchase should be made by B. on joint

account, each to furnish half of the purchase-money. Plaintiff placed in the hands of B. sufficient funds to pay for his half. At the time of the agreement the amount of the securities and the price were not known In an action for an accounting, *held,* that B. became the agent of plaintiff as to the half interest of the latter, and a *quasi* trustee of the money placed in his hands, and of the property purchased ; that the plaintiff had the right to call B. to account in equity, and the burden was upon the latter of showing both the price paid and what property was purchased.

(Argued October 19, 1883 ; decided November 20, 1883.)

APPEAL from judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an order made December 23, 1881, which affirmed a judgment in favor of defendant, entered upon the report of a referee.

This was an action for an accounting.

The complaint alleged in substance that an agreement was made in September, 1878, between the plaintiff and defendant Brooks for a joint purchase of a lot of securities then held by one Potter, the executor of Ward ; that the defendant Brooks had the sole management of the purchase; that the plaintiff, in the first instance, advanced nearly the whole of the purchase-money ; that the plaintiff has no knowledge of the precise facts as to the property purchased, or as to the amount of the purchase-money ; that the plaintiff has received a certain portion of the purchased property, but whether his full half he does not know ; that he has been reimbursed part of his advances, but whether the full half he does not know. He, therefore, asked an accounting, with a judgment for such an amount of money and such proportion of the securities as may equalize his interests with those of the defendants, defendant Mifflin having an interest in Brooks' half, as such interests may be adjusted on the accounting.

The referee found the following facts : One Potter, as executor of the will of one Ward, deceased, was the owner of 3,578 shares of the capital stock of a corporation known as the Silver Islet Consolidated Mining and Lands Company ; $22,750 in bonds and scrip of the same company, at its par value ; $3,000 in bonds of the Silver Islet Mining Company of Lake Superior,

at their par value ; said last-mentioned bonds being convertible into bonds and stock of the Silver Islet Consolidated Mining and Lands Company.  On or about the 20th of September, 1878, a contract was entered into between the plaintiff on the one part and the defendants, Mifflin and Brooks, on the other part, by which it was agreed that the said Brooks should negotiate for and purchase, at the best terms that could be obtained, all the above-named stock and bonds, and that when so purchased one-half of said stock and one-half of said bonds should be delivered to and become the property of the plaintiff, on his paying therefor one-half of the purchase-money.  On or about the 25th of September, 1878, Brooks, acting for himself and Mifflin, purchased of the said Potter all of said stock and bonds, and on or about the 5th day of October, 1878, delivered to the said plaintiff all of the half of said stock and bonds. The price paid for said stock and bonds by Brooks was the sum of $44,280, one-half of which sum was paid by plaintiff to Mifflin and Brooks.   The referee also found that said Brooks has fully accounted to plaintiff for all said stock and bonds, which were by the terms of said agreement to be delivered to plaintiff, and also for the purchase-price paid by said Brooks and the plaintiff as the consideration therefor.

It was claimed by plaintiff that there was included in the purchase three hundred and sixty-four shares of the stock of the Ontario Mineral Lands Company, and a note of $28,000 of the Silver Islet Mining Company.   Plaintiff asked the referee to find in substance that said securities were, in fact, included ; also, that defendants have not rendered an account of the transactions, save that defendant Brooks stated by telegram that he had paid for the securities $42,280 ; that no transfer has been made to plaintiff of any right or interest in the additional securities so claimed to be included, or in the agreement of purchase ; that defendant Brooks offered no evidence on the trial as to the amount paid by him on the purchase.   The referee refused to find or pass upon these facts, on the ground that it did not appear to him to be material.

On the trial defendant Brooks was sworn on his own behalf for the purpose of showing that he did not obtain the additional securities. On his cross-examination he was asked as to the sum he actually paid for the property purchased. This was objected to and excluded on the ground that it was not within the range of a cross-examination.

The further material facts appear in the opinion.

*Albert Stickney* for appellant. The fact of a common adventure, taken in connection with the fact that the management of the adventure has been intrusted to one party, entitles either party, in case of a difference, to maintain an action for an accounting. (Story's Eq. Jur., § 466.) It is not necessary that the parties should have been partners. (*Marston* v. *Gould*, 69 N. Y. 224, 225.) It lies for single transactions where there has been no long series of items. (*Dyckman* v. *Valiente*, 42 N. Y. 549; *Whiton* v. *Spring*, 74 id. 169; Story's Eq. Jur., § 463; *Mackenzie* v. *Johnston*, 4 Madd. 373.) It is not necessary that there should be mutual accounts. (*Shepard* v. *Brown*, 4 Gifford, 208; *Hemings* v. *Pugh*, id. 456; Story's Eq. Jur., § 458.) Nor is it necessary that the plaintiff should first establish that there is any thing due him. (*Cheesman* v. *Wiggins*, 1 T. & C. 595; 1 Daniell's Ch. Pl. [5th Am. ed.] 857; 1 C. E. Green; 1 Russ. Ch. 110.)

*George H. Adams* for respondent. The claim that, as between Marvin and Brooks, there was a partnership, or *quasi* partnership, is not sustained by the evidence. (Pars. on Part. 44, 47; *Coop* v. *Eyre*, 1 H. Bl. 37; *Gibson* v. *Lupton*, 9 Bing. 297; *Hoar* v. *Dawes*, 1 Doug. 371; *Ward* v. *Gaunt*, 6 Duer, 257; *Finkle* v. *Stacy*, Select Cases in Chancery, 27.) The very foundation of the jurisdiction of a court of equity to take an accounting is, with some few exceptions, that a bill of discovery is brought. (Story's Eq. Jur., §§ 458, 459; *Fowle* v. *Lawrason*, 5 Peters, 494, 502; *Navalshaw* v. *Brownrigg*, 1 Sim. Ch. [N. S.] 573, 584; *Blyth* v. *Whiffin*, 27 L. T. Eng Ch. 330; *Smith* v. *Leveaux*, 2 DeG., J. & S. 1; *Salter* v.

*Ham,* 31 N. Y. 321 ; *Hazard* v. *Hazard,* 1 Story's C. C. 371.)
The plaintiff's claim that, technically, he can have his action
for account, because of the relationship of the parties, no matter
whether or not, after the accounting, he may be entitled to
any relief, cannot be sustained. (*G. W. Co.* v. *Conliffe,* 43 L.
J. Ch. 741 ; 1 Daniell's Ch. Pr. 857, *n.* ; *Campbell* v. *Campbell,*
4 Halst. Ch. 743.)  The referee was right in refusing to allow
the plaintiff to cross-examine the defendant Brooks upon mat-
ters not entered into on his direct examination, (1 Greenleaf's
Evidence, § 445; *Houghton* v. *Jones,* 1 Wall. 702, 706 ;
*Rock* v. *Meiner,* 2 J. & S. 158, 160 ; *Bears* v. *Copley,* 10
N. Y. 93 ; *Union B'k* v. *Mott,* 39 Barb. 180, 185 ; *Neil* v.
*Thorn,* 88 N. Y. 270, 275.)

FINCH, J.  There has been no accounting in this case such
as a court of equity awards when it determines that such relief
is proper.  The finding of the referee that Brooks had fully
accounted for the stock and bonds and the purchase-price of
the.same, must be understood in connection with the theory of
the report that Brooks was to purchase the whole of the stock
and bonds, and then one-half of each was to be delivered to
and "become the property of" the plaintiff, "on his paying
therefor one-half of the purchase-money."  That view of the
transaction makes it an ordinary contract of purchase and sale,
having in it no element of agency with trust and confidence
reposed, and leaves the plaintiff to his legal remedy and with
no right to an accounting in equity.  Such an accounting, when
decreed between parties standing in a confidential relation, and
followed by proof of money or property intrusted to the agent,
throws upon the latter the burden of rendering an account
and an explanation, and requires him to show that his trust
duties have been performed and the manner of their perform-
ance.  Such a decree proceeds upon the ground that the defend-
ant stands in the attitude of an agent dealing to some extent
with the money or property of the other party ; intrusted in
a confidential relation with an interest which makes him a
*quasi* trustee, and by reason of that relation knowing what the

other party cannot know, and bound to reveal to him the entire truth. The equitable jurisdiction has always rested largely upon such relation of confidence, involving the need of discovery and the duty of explanation, and hence the burden of such explanation and the proof of its truth fell, in such cases, upon the defendant whose conduct was questioned, whenever an accounting was decreed, and required of him the extreme of good faith. (3 Greenl. Ev., § 253; 1 Story's Eq. Jur., §§ 315, 316.)

No such result occurred in this case. No interlocutory decree for an accounting was made, and no accounting with the burden of explanation resting on the defendant was had. As. to the two material facts of which in the complaint the plaintiff averred his ignorance, whether the property delivered was the whole of the property bought, and whether the purchase-price represented was the actual purchase-price paid; questions which on an accounting in equity Brooks would have been required affirmatively to answer; as to these the trial left the original doubt undispelled. The findings of the referee, therefore, evidently mean that the plaintiff was not entitled to an accounting, and that, so far as the complaint alleged an agreement of purchase at an understood price, that contract was fully performed, and Brooks had accounted for the property bought.

If, upon the facts, the referee's view of the nature of the transaction was a correct one, his conclusion and that of the General Term were right; but if the dealing between the parties was something different from that, and of such a character as to entitle the plaintiff to a decree for an accounting, then the dismissal of the complaint was wrong. We are thus conducted to an inquiry into the nature of the transaction.

If at first it is possible to say that before Brooks went to Detroit there was merely an agreement of purchase and sale, and a relation of debtor and creditor; that Brooks was to buy for himself, and then as owner sell one-half to Marvin, upon the contingency of an original price less than $50,000, though that theory is shaken and qualified by the understanding of a

joint interest, by the assurance that Marvin was to be in "on the hard pan," and by the offer to participate equally in the enterprise ; if at first the true nature of the agreement was doubtful and debatable, it ceased to be so when Brooks reached Detroit, and a new series of events occurred, throwing light upon the understanding. Brooks conducted his negotiations for the purchase through Darling & Co., who dealt with Potter, the executor having control of the Ward interest. Nothing indicates that Darling & Co. were any thing else than the agents or brokers of Brooks. Besides the stock and bonds, a stock-note of $28,000 of the old Silver Islet Mining Company, and three hundred and sixty-four shares of the stock of the Ontario Mineral Lands Company were supposed, both by Brooks and Marvin, to belong to and form a part of the Ward interest, intended to be purchased. On the 26th of September Brooks telegraphed that a contract of purchase had been made with Potter at the price of $45,000 ; that fifteen per cent was to be paid down that day, and that the balance would be subject to draft with the securities attached. But the dispatch did not stop here, as it would have done if Marvin had no interest except to buy of Brooks when the latter had become owner. He adds a request that Marvin would deposit his share of the down payment in the American Exchange Bank, and have it telegraphed to the Second National Bank of Detroit, and explains that he, Brooks, will deposit "for Boston account here ; " that is, will provide on the spot his half of the down payment. Not getting an immediate answer, Brooks on the same day telegraphs again : "Answer something. Will take one-fifth of *your half* if desired." These dispatches put Marvin in the position of a joint purchaser. If he was to buy of Brooks, after the latter had become owner, he could see and know what securities Brooks in fact had to sell, and judge or ascertain, before parting with his money, whether they constituted the whole of the Ward interest, and whether the price demanded was the true half of that paid. But now he is called on to buy of Potter one-half of the Ward interest at one-half of $45,000, asserted to be the price demanded, and to part

with his money before he knows what that interest is, and in sole reliance upon the good faith of Brooks as to price. The latter becomes Marvin's agent for the purchase of one-half of the property, and asks to be intrusted with Marvin's money to be employed in carrying out the purpose of the agency. Marvin observes the peculiarity of the situation, and asks two questions, made necessary by the demand upon him. He inquires if the Ward interest includes " explicitly " the stock-note, and the three hundred and sixty-four shares. He is answered that every interest is included. He inquires when the balance is to be paid, and is told, in five days. Thereupon he remits to Brooks, as requested, on the same 26th day of September, the sum of $3,375, being the one-half of the required down payment. Stopping here, we cannot fail to see that new elements mark the character of the transaction. Through Brooks, acting as his agent, and in reliance upon Brooks, both as to what is bought, and what is to be paid, Marvin has become the purchaser of one-half of the Ward interest from Potter, and parted with his money to the agent, to be by him applied upon that purchase. The case becomes more than a mere agency. It becomes one in which the agent is intrusted with the principal's money, to be expended for a specific purpose. The agent takes the fund in trust, to appropriate it to the directed purchase. Whether he did so actually appropriate it, Marvin does not know from any proof, evidence, or voucher. Brooks has said so in his unsworn account rendered, and that is all. Marvin has been forced to stand in the litigation with the burden on himself of showing a misappropriation by Brooks. He has never been allowed the right of requiring Brooks to prove how, and in what manner, he performed the trust duty assumed. Had he a right to demand that remedy, and by an accounting shift so much of the burden of proof to the agent, and require him to show, by competent evidence, what became of the money confided to his care ? It is best, perhaps, before answering this question, to follow the transaction to its close, and understand it in all its scope. There was some difficulty in making up the balance of the purchase-money

to meet the expected draft. Mifflin, who was to furnish $15,000 upon the Brooks half, was slow, and Marvin deposited $38,500 to meet the expected draft, having been requested by Brooks to see that the funds were supplied. Before the draft arrived the $15,000 was deposited, and replaced so much of the sum provided. The draft came. . It was drawn by Brooks upon the Exchange Bank, and payable to the order of Darling & Co. But the latter were not the vendors. The answer alleges that they were, but every telegram and letter of Brooks asserts the contrary; his statement of account shows Darling & Co. furnishing part of the down payment, to be paid to Potter on the Brooks and Marvin purchase; and the referee correctly finds that Brooks bought of Potter " through Darling & Co." It is quite probable that the vendor, when trusting this firm with possession of the securities, held them responsible for the purchase-money, but when they received it on the draft they took it, not as the vendors, but for and in behalf of Brooks, and by his direction, and for the purpose to which Brooks was bound to apply it. So that the transaction was in legal effect again that Brooks was intrusted with Marvin's money, to be by him " through Darling & Co.," appropriated to the payment of the vendor.

But attached to the draft were the securities. The stock-note and Ontario shares were not among them ; and it is said Marvin paid his money for precisely what was delivered, and knew exactly what he was getting for his payment. But that is not true, for two reasons. The draft was dated October 4, and paid the next day. Four days earlier Brooks had written " I will collect the $28,000 note," and under date of October 2, Brooks had added to the order which he sent Marvin for the latter's share of stock and bonds, the statement " Potter is to furnish note and Ontario stock." Marvin had a right, therefore, to assume that he was paying his money for something more bought than was delivered, and directing the bank to pay, expressly reserved his right as against other parties to demand the balance of his purchase. It seems to us, therefore, beyond reasonable question that Brooks was the agent of Mar-

vin to purchàse for him of Potter the one-half of the Ward interest, whatever that in fact might prove to be beyond what was certainly known; that the agent was to pay for such half precisely what he himself paid for the remaining half but not to exceed $25,000; that the agent was intrusted with the money of the principal to be used in effecting such purchase; and that whether he so applied the whole of it, and what the securities bought really were, the agent accurately knew and could readily explain, while the principal could not know, except as the result of investigation and inquiry. We think such a case justifies a resort to equity and a decree for an accounting.

The basis and extent of the equitable jurisdiction over màtters of account appears to have been seldom considered in our courts, but often discussed in the English authorities. We have been referred to many of these, but they seem to us not harmonious, and occasionlly difficult to reconcile. (*Phillips* v. *Phillips*, 9 Hare, 471; *Dinwiddie* v. *Bailey*, 6 Ves. 139; *Mackenzie* v. *Johnston*, 4 Mad. 374; *King* v. *Rossett*, 2 Y. & Jerv. 33; *Massey* v. *Banner*, 4 Mad. 416; *Padwick* v. *Hurst*, 18 Beav. 575; *Navulshaw* v. *Brownrigg*, 2 DeG., M. & G. 441; *Makepiece* v. *Rogers*, 11 Jur. N. S. 314; *Barry* v. *Stevens*, 31 Beav. 258; *Foley* v. *Hill*, 2 H. of L. Cas. 28; *Moxon* v. *Bright*, L. R., 4 Ch. App. Cas. 292.) The best considered review of the authorities puts the equitable jurisdiction upon three grounds, viz.: The complicated character of the accounts; the need of a discovery, and the existence of a fiduciary or trust relation. (1 Story's Eq. Jur., § 459, and note 5.) The necessity for a resort to equity for the first two reasons is now very slight, if it can be said to exist at all, since a court of law can send to a referee a long account, too complicated for the handling of a jury, and furnishes by an examination of the adverse party before trial, and the production and deposit of books and papers, almost as complete a means of discovery as could be furnished by a court of equity. But the jurisdiction of the latter court over trusts and those fiduciary relations which partake of that character remains, and in such cases the right to an accounting seems well established. But the existence of a bare agency is not sufficient. If it was, it would draw into equity every case

of bailment in which an account existed. In *Moxon* v. *Bright* (*supra*), it was said that there are "numerous cases showing that where the relation of principal and agent had imposed a trust upon the agent, the court would entertain a bill for an accounting, and the only difficulty was in determining what constituted this species of trust." In *Foley* v. *Hill* (*supra*), the question arose over that sort of relation which exists as between a banker and his depositor, and it was held to be merely that of debtor and creditor. The court added, however, that as between principal and factor the equitable jurisdiction attached, because the latter partook of the character of a trustee, and that "so it is with regard to an agent dealing with any property * * and though he is not a trustee according to the strict technical meaning of the word, he is *quasi* a trustee for that particular transaction," and, therefore, equity has jurisdiction. Something to the same general purport was said in this court. (*Marston* v. *Gould*, 69 N. Y. 225.) An accounting is always proper in cases of partnership, yet where the parties were not partners, but the relation existing was that of a *quasi* partnership, and the position of the party sued involved "the same trust, duties and obligations," the right to an accounting was declared. To the same effect are other authorities. (1 Story's Eq. Jur., § 463; *Shepard* v. *Brown*, 4 Giffard, 208; *Hemings* v. *Pugh*, id. 456.) In this case Brooks stood relatively to Marvin as his agent to purchase for him one-half of the Ward interest, and when intrusted with Marvin's money to be so applied, at a price to be by him determined, and to cover the whole of an unknown interest, he stood in a fiduciary relation, and became a *quasi* trustee of the money in his hands and of the property purchased, and Marvin has the right to call him to account in equity. The court, therefore, erred in dismissing the complaint, and in refusing to make the findings which would have shown the agency and that no accounting had been had.

The judgment should be reversed, the reference discharged and a new trial granted, with costs to abide the event.

All concur.

Judgment reversed.