village situated partly within a township where trafficking in liquor is permitted and partly in a township where it is prohibited. The object is simply to ascertain the number of inhabitants in a settled community for the purpose of determining the proper and equitable tax to be paid by any one who may, under the provisions of the law, be permitted to carry on the sale in said community. The premises of Bradsted are located in the town of Clarkestown, and the sale of liquor was permitted in that town at the time he applied for and procured the certificate. The fact that liquor could not be sold in that part of the village included within the township limit of Ramapo was not, in any sense, an injury to him. On the contrary, the tendency of that fact was to limit competition without lessening custom. The designation of the limits of an unincorporated village is to continue for five years, while the voters are at liberty to change the policy of the town every two years. It is quite apparent that the legislature must have had in view the possibility that a different policy might prevail with respect to the sale of liquor in different portions of an unincorporated village under the provisions of the act where such village is located in more than one town. The absence of any provision limiting the power of the commissioner to establish a boundary line around such a village must be deemed conclusive. On the other hand, the existence of such power does not conflict with any of the other provisions of the law. The taxes assessed are not to be apportioned in any event to the village or hamlet, but will go to the town in which the dealer or licensee resides. Section 13.

I have examined the other questions presented on this application, but do not regard them as worthy of extended consideration. The order prayed for should be granted.

Order granted.

---

GREEFF v. EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES.

(Supreme Court, Appellate Division, Second Department. May 2, 1899.)

1. INSURANCE—CONSTRUCTION OF POLICY.
   An insurance policy is to be construed most favorably to the insured, where such construction does not violate the letter of the policy.

2. SAME—REFERENCE TO CHARTER.
   The charter of an insurance company, which is made a public record by the statutes under which the company is organized, may be referred to in construing a policy.

3. SAME—MUTUAL COMPANIES—NET SURPLUS—DISTRIBUTION.
   A mutual insurance company's charter provided that at certain periods the officers should determine the net surplus, after deducting a sufficient amount to cover all outstanding risks and other obligations, and that each policy should be credited with an equitable share of said surplus. A policy provided that during its continuance it should be entitled to participate in the distribution of the surplus of the company according to such methods as the company should adopt, which methods were thereby ratified by every one who might claim under the contract. *Held* that, when the company had ascertained the surplus, the policy holder was entitled to a share of the whole thereof.

4. SAME—COMPLAINT BY POLICY HOLDER—SUFFICIENCY.
   A complaint by a policy holder in a mutual insurance company to recover his share of the net surplus is sufficient, if it shows that he is en-

titled to recover some amount, though he cannot state the exact amount · due him.

**5. SAME—RIGHT OF ACTION.**

   ·   Laws 1890, c. 400 (Insurance Law 1892, § 56), providing that proceedings for an accounting, or enjoining or interfering with the prosecution of the business of an insurance company, must be on application of the attorney general, except in certain cases, does not prohibit a policy holder in a mutual company from suing for the share of the net surplus to which his contract entitles him, though such action may compel the company to pursue different business methods if it is to possess itself of such surplus, or a part thereof.

**6. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—REMEDIES.**

     Laws 1890, c. 400 (Insurance Law 1892, § 56), providing that no proceedings can be brought, or order made, for an accounting, or enjoining or interfering with the prosecution of the business of any insurance company, or appointing a receiver, except on application of the attorney general, in so far as it denies to a policy holder in a mutual company, becoming such before the law was passed, the right to sue for his share of the net surplus, impairs the obligation of his contract.

    Goodrich, P. J., dissenting.

Appeal from special term, New York county.

Action by Emil Greeff against the Equitable Life Assurance Society of the United States. From a judgment sustaining a general demurrer to the complaint (52 N. Y. Supp. 503), plaintiff appeals. Transferred from First to Second department. Reversed. ✔

 · Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Dickinson W. Richards, for appellant.

William B. Hornblower (Charles B. Alexander, on the brief), for respondent.

WOODWARD, J. In 1882 the plaintiff in this action took out a policy of insurance upon his life, the defendant company writing the policy. The defendant company was organized in 1859 under the provisions of the general act for the incorporation of life and health insurance companies passed June 24, 1853. The policy written was what is known as an "endowment policy," and was to mature in 15 years, or in May, 1897. Under the. provisions of the law of 1853 (chapter 463), any number of persons, not less than 13, were authorized to organize themselves into a body corporate for the purpose of insuring the lives or the health of its policy holders. The method provided for the organization of these companies was by · filing a certificate with the comptroller—

"Which declaration shall comprise a copy of the charter they propose to adopt, and the said charter shall set forth the name of the company; the place where it is to be located; the kind of business to be undertaken by referring to and repeating the department of the first section of this act to which they refer; the mode and manner in which the corporate powers of the company are to be exercised; the manner of electing the trustees or directors and officers, a majority of whom shall be citizens of this state, and the time of such election; the manner of filling vacancies: the amount of capital to be employed; and such other particulars as may be necessary to explain and make manifest the objects and purposes of the company, and the manner in which it is to be conducted." Section 3.

The charter of the defendant, which is thus made a matter of public record, provides (article 6) that the insurance business of the company shall be conducted upon the mutual plan, and that:

"The officers of the company, within sixty days from the expiration of the first five years, from December 31, 1859, and within the first sixty days of every subsequent period of five years, shall cause a balance to be struck of the affairs of the company, which shall exhibit its assets and liabilities, both present and contingent, and also the net surplus, after deducting a sufficient amount to cover all outstanding risks and other obligations. Each policy holder shall be credited with an equitable share of the said surplus. Such equitable share, after being ascertained, shall be applied to the purchase of an additional amount of insurance (payable at death or with the policy itself), expressing the reversionary value of such equitable share, at such interest as the directors may designate, or if any policy holder so direct, such equitable share of surplus shall be applied to the purchase of an annuity, at such rate of interest as the directors shall designate, to be applied in the reduction of his or her future premiums.    *    *    *    In case of the death of any party insured prior to passing any period for striking of balance, as aforesaid, the board of directors may provide what (if any) share of such surplus shall be paid to such person."

In 1868 (chapter 118) and in 1872 (chapter 100) the laws affecting this class of insurance companies were amended so as to change the dividend periods, and the periods at which balances should be struck; but these provisions are not material to be considered in the disposition of the question to be determined on this appeal.

The policy under which the plaintiff claims was written for $20,000, and it contains a provision (No. 7 of provisions and requirements) that:

"This policy, during its continuance, shall be entitled to participate in the distribution of the surplus of this society, by way of increase to the amount insured, according to such principles and methods as may from time to time be adopted by this society for such distribution, which principles and methods are hereby ratified and accepted by and for every person who shall have or claim any interest under this contract."

When this policy became due, in 1897, the company paid the face of the policy, together with $3,932 increase, due to a division of the surplus of the society, and entered into an agreement with the plaintiff that this should not prejudice the plaintiff in his right to claim that he is entitled to a larger sum by way of surplus or profits. The plaintiff now brings an action to recover the sum of $7,087.38, which sum he claims is due him under the provision of his contract that he shall participate in the net surplus of the defendant. In addition to the formal averments, the plaintiff sets forth in his complaint that he has made all of the payments required under the conditions of his policy, and that the defendant annually "caused a balance to be struck of the affairs of the society, exhibiting its assets and liabilities, both present and contingent, and also the net surplus after deducting a sufficient amount to cover all outstanding risks and obligations"; and he then gives the amount of the surplus announced by the defendant in each of the years from 1882 to 1896, both inclusive, showing a net surplus in the year 1896 of $43,277,179. He then sets forth the amount of surplus which has been apportioned to him in each of the several years, aggregating $3,932. It is then averred that:

"The said several divisions of surplus distributed to plaintiff have been from sums received in excess of the several amounts set forth as the balance of surplus each year, so that each distribution of surplus has been from profits accruing during the year, without diminishing the surplus on hand at the end of the preceding calendar year; and this plaintiff has received no portion of the net surplus of $43,277,179, ascertained and declared by the defendant as the amount on hand on December 31, 1896."

The plaintiff then continues that:

"According to the principles and methods adopted by the defendant for the distribution of surplus, there was distributed in the year 1895 to the plaintiff $328 as his proportion of a distribution of a surplus amounting to $2,002,954.23, and that the proportion due this plaintiff of the $43,277,179, net surplus ascertained on December 31, 1896, according to the same principles and methods which were the principles and methods in force during the life of plaintiff's policy, is $7,087.38, in addition to the amount of surplus actually awarded, of $3,932; making a total amount of $11,019.38 of surplus, and $20,000 of principal."

It is further alleged that the $20,000, with the $3,932 of surplus, has been paid, and that the plaintiff is not to be prejudiced thereby in his effort to secure a further sum, and that there is due and unpaid to the plaintiff the sum of $7,087.38, and interest thereon from the 2d day of May, 1897, and that payment was demanded before the commencement of this action, which payment was refused.

The defendant demurs to this complaint on the single ground that it does not state facts sufficient to constitute a cause of action, and from the interlocutory judgment entered in behalf of the defendant an appeal comes to this court.

All of the facts stated must, for the purposes of this appeal, be deemed to be admitted by the demurrer; and a careful examination of the pleadings fails to disclose to this court any lack of facts necessary to constitute a cause of action. It is conceded that the plaintiff stands in a contractual relation to the defendant, and that the defendant has stipulated in its contract that the plaintiff, during the continuance of the policy, shall be entitled to participate in the distribution of the surplus of this society; but it is urged on behalf of the defendant that the plaintiff has forfeited his right to insist upon an equitable distribution of all of the surplus, by the provision in the policy that the distribution shall be made "according to such principles and methods as may from time to time be adopted by this society for such distribution, which principles and methods are hereby ratified and accepted," etc. The learned trial court has adopted this view of the question, but we are unable to concur in the conclusion that the minds of the parties ever met in an agreement that the defendant should have the arbitrary power, in distributing this surplus of the society, to take out two-thirds of the surplus, and to divide the remainder. The contract was drawn by the defendant, and is therefore to be construed most favorably to the plaintiff, where this construction does no violence to the letter of the contract. It is not within reason to suppose that the plaintiff, who was paying $1,457 per year for this insurance, with the inducement held out to him that he was to participate in the distribution of the surplus of the society, had any other idea than that he was to participate in the distribution of all of the surplus declared by the defendant; and the waiver or ratification

which the defendant has inserted in its policies cannot be understood to go to the question of determining what portion of the surplus the society will distribute, but to the principles and methods of distributing the surplus when it has been determined.

The charter of the company, which is made a public record by the provisions of the statute under which it is organized, may properly be appealed to, at least for the purpose of aiding us in the proper construction to put upon the agreements contained in the policy; and in this it is provided that the officers of the company shall "cause a balance to be struck of the affairs of the company, which shall exhibit its assets and liabilities, both present and contingent, and also the net surplus, after deducting a sufficient amount to cover all outstanding risks and other obligations. Each policy holder shall be credited with an equitable share of the said surplus." The affairs of the company were to be conducted upon the mutual plan. The stockholders were limited by law to semiannual dividends of $3\frac{1}{2}$ per cent., and each policy holder was to be credited with an equitable share of the profits of the company, after the deduction of an amount sufficient to meet all of the obligations of the company. This was the understanding which the company had of its duties and obligations in accepting premiums. It, in effect, stipulated with the state, as a condition of its being, that it would place in the hands of its policy holders a contract embracing these provisions; and it cannot now be heard to say that it has, by a mere jugglery of words, kept this promise in form, only to defeat it in substance. The substance of the contract, as set forth in the policy, construed, as it should be, in connection with the charter, is that the plaintiff shall be entitled to an "equitable share of the said surplus." If a grocer entered into a contract with his customers to give them an equitable share of the net profits of his business, after deducting enough to pay all of his outstanding or contingent obligations, with 7 per cent. interest, no one would contend that he was fulfilling that contract if he put two-thirds of the net profits into a fund for his own use, and then divided the remainder. There would be nothing equitable about that, and there is nothing equitable about the plan of apportioning the net surplus of the defendant. Equity suggests the highest practicable form of justice, and its use in connection with a division of the surplus of the defendant is a pledge that the funds of the society, after meeting all of its obligations, shall be distributed among those who have contributed their premiums on the basis of the amount which they have paid; and the only exception which the company has laid down for itself is that, "in case of the death of any party insured prior to passing any period for striking of balance, as aforesaid, the board of directors may provide what (if any) share of such surplus shall be paid to such person." Article 6. If we confine ourselves to the letter of the policy, it will not bear the construction sought to be put upon it by the defendant. The contract is that "this policy, during its continuance, shall be entitled to participate in the distribution of the surplus of this society." It is not a part of the surplus, but "the surplus" in which the policy is to share. The society could not share in the distribution of the surplus. It could take only the necessary

amount to pay the semiannual dividends, and the obligations, present or contingent; and the remainder, according to its own stipulation with the state, was to be credited to the policy holders. "Each policy holder," says the charter, "shall be credited with an equitable share of the said surplus." With each policy holder credited with an equitable share of the fund, there would be no part which could be divided with the defendant; and, the company having stipulated a system of distribution from which it was excluded, it is hardly in a position to say that it has now adopted a method by which it retires, for its own credit, two-thirds of the declared surplus, and that it is fulfilling in good faith its contract by dividing the remainder with the policy holders. It is certainly morally estopped from claiming that the plaintiff has, by its own clause in the policy, relinquished his right to share in the surplus of the society, without first having dropped from the basis of calculation two-thirds of the surplus which has been declared. That the society has a large discretion in determining the amount of the surplus, that it may largely increase its reserve fund for the security of its policy holders, or that it may deduct much more than at present to cover contingent liabilities, is not disputed. The company may take all steps which are demanded by a wise and prudent management to insure the prompt payment of losses, and to successfully carry on the business; but, when it has once determined what the surplus is, it must, under its contract with this plaintiff, make an equitable distribution, not of a portion of the fund, but of all of it. That is the essence of a mutual insurance contract. The policy holders are to get their insurance upon the basis of what it actually costs, reasonable allowance being made for the use of the capital and talent employed in the transaction of the business. This company, organized in 1859 with a capital of $100,000, has a surplus of over $43,000,000; and if this surplus is not to be divided among those who have paid the premiums, but is to go eventually to the stockholders, the institution is builded upon a false pretense, for it has held out to its policy holders the promise that this fund should be distributed among them, and it has avoided its taxes to the state upon the proposition that the fund was held "for the exclusive benefit of the assured." Laws 1857, c. 456. If, then, there is a contract between the parties to this action, and if the defendant has agreed, upon a sufficient consideration, to give the plaintiff an equitable share of the surplus of the society, and if the distributions heretofore made have been from the earnings of the company without impairment of the surplus, and if it is true that the company had a surplus of something over $43,000,000 at the maturing of plaintiff's policy (and these matters are all alleged in the complaint and conceded by the demurrer), we are unable to see any essential particular in which the plaintiff has failed to state a cause of action. It is true, of course, that he is obliged, from the nature of the case, to reach a conclusion as to the amount which is due by means of a mathematical calculation, based upon a somewhat indefinite state of facts; but it is not necessary that he should be able to exactly compute the amount due. The complaint is good, if it sets forth facts from which the requisite allegations can be fairly gathered, "though the statement of them may be

argumentative, and the pleading deficient in logical order and in technical language." Sage v. Culver, 147 N. Y. 241, 245, 41 N. E. 513. The pleadings are sufficient to show that the plaintiff is entitled to recover a sum of money under his contract with the defendant, the exact amount of which may be properly left to the determination of the jury upon the trial of the action. Rowell v. Janvrin, 151 N. Y. 60, 69, 45 N. E. 398.

But it is urged that, to determine the exact amount due to the plaintiff, an accounting will be necessary, and that the plaintiff has no standing in court; the legislature having enacted (chapter 400, Laws 1890; section 56, Insurance Law 1892) that "proceedings for accounting, injunction or a receiver, must be upon application of the attorney-general," and that "no order, judgment or decree providing for an accounting or enjoining, restraining or interfering with the prosecution of the business of any domestic insurance corporation or appointing a temporary or permanent receiver thereof shall be made or granted otherwise than upon the application of the attorney-general, on his own motion or after his approval of a request in writing therefor of the superintendent of insurance, except in an action by a judgment-creditor or in proceedings supplementary to execution." These provisions of law were under consideration in the case of Swan v. Association, 155 N. Y. 9, 49 N. E. 258, where it was assumed by the court that the legislature had enacted into the statutory law of the state its decision in the case of Uhlman v. Insurance Co., 109 N. Y. 421, 17 N. E. 363; but we do not find, either in the statute or in the Uhlman Case, anything to indicate that it was ever the policy of this state to deny to any individual the right to bring an action to recover upon a contract, even against an insurance company. In the Uhlman Case the plaintiff alleged that the defendant had, during the term of the policy, wrongfully appropriated the surplus and profits, or a large portion thereof, belonging to the plaintiff under the policy, and demanded judgment that the defendant be compelled to render a detailed account of its business during the life of plaintiff's policy. The court refused to grant the relief demanded, but based its refusal largely upon the proposition that the plaintiff had an action at law upon his contract, and that he had practically the same opportunity to secure an accounting in his action at law as in equity. After discussing the opinion of Finch, J., in the case of Marvin v. Brooks, 94 N. Y. 71, the court in the Uhlman Case say:

"Considering the fact as stated by Finch, J., in the case above alluded to, that the plaintiff has now all the facilities for examining a complicated account in an action at law that he would have in equity, if there are other reasons—important and material ones—existing against the assumption of jurisdiction by a court of equity of an action of this nature, those reasons should have their full weight; and if, after giving due effect to all the circumstances, it appear that there would be a balance of very great inconvenience and possible oppression to the defendant, the plaintiff should be remitted to his action at law to recover his damages, in which action, if the taking of an account becomes necessary, it may be easily taken."

If the court in Swan v. Association, supra, is right in assuming that the legislature followed its ruling in the Uhlman Case in the legislation of 1890 and 1892, then it may fairly be contended that the

legislature went no further than to deny to the individual a right to bring an equitable action for the. immediate purpose of compelling an accounting, or the securing of an injunction, or other interference with the business of an insurance corporation. This seems to have been the construction which the court put upon these statutes, for it is particular to point out (Swan v. Association, 155 N. Y. 17, 49 N. E. 260) that "it will be observed from a reading of this complaint that this cannot be regarded as an ordinary action to enforce some merely personal obligation," and, "as suggested previously, there is a great and an obvious distinction between an ordinary action, where an individual seeks a remedy for some violation of his rights, and where there can be an adjustment of the dispute without necessarily or materially affecting the rights of others, and a case like the present one, which would draw after its determination in the plaintiff's favor apparently radical changes in the management of the affairs of the corporation, and would involve an accounting as to corporate dealings with a great number of other persons." Id., 155 N. Y. 18, 49 N. E. 260. Be this as it may, however, the statute cannot be invoked to prevent this plaintiff from asserting his rights under the provisions of his contract with the company. While it may be conceded that the legislature has a right to protect its creatures against equitable actions by individual policy holders calculated to embarrass the affairs of the corporation, and to interfere with the higher rights of the policy holders as a whole, it cannot be successfully maintained that the legislature is acting within its constitutional sphere in attempting to make the right of· an individual to bring an action upon a contract to depend upon the whim or caprice of a public official. The plaintiff entered into his contract in 1882. He paid his premiums as a consideration for his insurance, and the covenant of the company that it would divide its surplus equitably with him, and the legislature has no power to impair the obligation of that contract. Const. U. S. art. 1, § 10. We have not overlooked those cases in which it is held that the legislature has a right to change the remedy. It is undoubtedly true that a right inheres in the state to change the method of procedure, and to do many acts which affect the contract; but it can hardly be said that a statute which makes a party to a contract depend for its enforcement upon a third person is a mere change of remedy. It is a violation of the law of the contract, and as such is within the inhibition of the federal constitution. "A contract," say the court in the case of Sturges v. Crowninshield, 4 Wheat. 122, "is an agreement in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract." This view of the matter is taken by the court in the case of Ogden v. Saunders, 12 Wheat. 213, 302, where it is said that "the law of the contract forms its obligation." Mr. Justice Trimble, in a concurring opinion in the same case, after reviewing many authorities as to the meaning of the language "impairing the obligation of contracts," says:

"From these authorities—and many more might be cited—it may be fairly concluded that the. obligation of the contract consists in the power and efficacy of the law which applies to, and enforces performance of, the contracts,

or the payment of an equivalent for nonperformance. The obligation does not inhere and subsist in the contract itself, proprio vigore, but in the law applicable to the contract. This is the sense, I think, in which the constitution uses the term 'obligation.'"

If this is the construction to be put upon the constitution,—and we find no authorities running counter,—then it is obvious that the legis.ature could not deprive the plaintiff in this action of the rights which he had under the law of his contract at the time it was made. He then had a right to bring an action upon his contract without the intervention of any third party, and the obligation of his contract is unquestionably impaired if his right to bring this action must now depend upon the will or caprice of the attorney general of the state. We do not believe, however, that the legislature ever intended to interfere in this class of actions, but merely in those actions which were brought for the purpose of an inquiry into the business methods of the corporation, and which affected all of the policy holders of a given class. The fact that this action may compel a different method of business, if the corporation is to possess itself of the surplus, is of no consequence. That is merely an incident. This action is brought upon the contract which the plaintiff has entered into with the defendant, and the plaintiff has a right to have the question heard upon its merits.

The pleadings clearly indicate that the defendant owes the plaintiff an amount equal to that which is claimed, and, if it does not, the matter may be determined upon the trial of the action. Rowell v. Janvrin, supra.

Conceding the facts stated in the pleadings, the plaintiff is entitled to judgment, and we conclude, therefore, that the interlocutory judgment appealed from should be reversed, and the demurrer overruled, with costs. All concur, except GOODRICH, P. J., dissenting, and BARTLETT, J., not voting.

GOODRICH, P. J. (dissenting). I cannot agree in the prevailing opinion with my associates. The charter and the policy form one contract, and resort must be had to both in order to ascertain what the contract of the policy really is. The charter (article 6) provides that the officers of the corporation shall cause a balance to be struck of the affairs of the corporation, which shall exhibit its assets and liabilities, both present and contingent, "and also the net surplus after deducting a sufficient amount to cover all outstanding risks and other obligations. Each policy holder shall be credited with an equitable share of the said surplus. Such equitable share after being ascertained shall be applied," etc. It will be observed that three things are recognized in this article, viz.: A "net surplus," "an equitable share of the said surplus," and the application of such "equitable share after being ascertained." The act of 1872 (chapter 100) provided that the corporation might ascertain "the proportion of surplus accruing to each policy holder, * * * to distribute the proportion found to be equitable." This seems to contemplate something more than a mere mathematical calculation of the proportion of the surplus to be devoted to the policies upon

which it is to be applied, and to authorize the directors of the society to decide how the net surplus is to be distributed,—how much is to be applied to policy holders, and how much is to be reserved for the contingencies of insurance. This is borne out by the language of the policy, which was issued subsequently to the act of 1872, when it says that the policy in question "shall be entitled to participate in the distribution of the surplus of this society by way of increase to the amount insured, according to such principles and methods as may from time to time be adopted by the society for such distribution, which principles and methods are hereby ratified and accepted by and for every person who shall have or claim any interest under this contract." In general, only the directors of any corporation have the power to decide what amount or share of its earnings are to be applied in dividends, and I can see no different principle which limits the authority of the directors of this society to decide what part of the net surplus is to be distributed to the policy holders at any particular period. What necessity for ratification and acceptance of principles and methods of distribution would exist, if only a mathematical division of the entire surplus was intended? Indeed, the policy itself says that the holder shall participate in the "distribution of the surplus," not in the surplus itself; and it was to this distribution, and the principles and methods thereof, that the policy refers, as ratified and accepted. It is conceded in the prevailing opinion that the directors have a large discretion in determining the amount of the surplus, and that they may largely increase the reserve and contingent funds. I cannot see any greater exercise of discretion in doing this than in distributing only a part of the surplus to the policy holders, and reserving the balance for the protection of the policy holders, or that any different result would be attained, if, instead of calling the $43,000,000 a "surplus," it had been called "contingent reserve." The provisions of the charter, the policy, and the law of 1872 all seem to intend that the directors should have power to decide what part of the surplus should be distributed, and how it should be distributed, to policy holders, at stated periods. To hold otherwise would be to destroy the discretion conferred upon the officers in deciding what part of the surplus is necessary to protect all policy holders, present and future. I cannot believe that the policy of the law, or a fair interpretation of the contract, has any such result; and I think the interlocutory judgment should be affirmed.