In the Matter of the Judicial Settlement of the Account of Proceedings of ROBERT E. BERGMAN, Guardian of GEORGE ROBERT BUNTING, Infant.

GEORGE ROBERT BUNTING, Objectant, Appellant, Respondent; EMMA J. BERGMAN, as Administratrix, etc., of ROBERT E. BERGMAN, Deceased, and MARYLAND CASUALTY COMPANY, Respondents, Appellants.

In the Matter of the Judicial Settlement of the Account of Proceedings of ROBERT E. BERGMAN, as Executor, etc., of KATHERINE L. BUNTING, Deceased.

GEORGE ROBERT BUNTING, Objectant, Appellant; EMMA J. BERGMAN, as Administratrix, etc., of ROBERT E. BERGMAN, Deceased, Respondent.

In the Matter of the Judicial Settlement of the Account of Proceedings of ROBERT E. BERGMAN, as Trustee for GEORGE ROBERT BUNTING under the Last Will and Testament of HARRY F. L. BUNTING, Deceased.

GEORGE ROBERT BUNTING, Objectant, Appellant; EMMA J. BERGMAN, as Administratrix, etc., of ROBERT E. BERGMAN, Deceased, Respondent.

First Department, December 20, 1940.

*Hugo Wintner* of counsel [*Robert J. Fox* and *John G. Markey* with him on the brief; *Walter A. Donnelly*, attorney], for the objectant-appellant-respondent.

*William Richards* of counsel for the respondent-appellant Maryland Casualty Company, *Vincent J. La Gamma* of counsel for the respondent-appellant Emma J. Bergman, as administratrix, etc. [*Paul A. Bogan* and *John L. Coyle* with them on the brief].

GLENNON, J.  Three estates are involved in this accounting. The proceedings were consolidated for the purposes of trial.  The objections relate respectively to final accountings filed by one Robert E. Bergman, an attorney, in connection with the estates. In order to have a clear understanding of the matters involved, it is necessary to give a short sketch of the circumstances which led up to the controversy under consideration.

Within a period of one month in October, 1918, the objectant's father, George W. Bunting, his mother, Emma Bunting, and his uncle, Harry F. L. Bunting, died.  At that time the objectant, an only child, was one year old.  Each of the decedents left an estate in all of which the objectant, who will hereafter be referred to as the infant, was either the sole beneficiary or the devisee of a substantial part thereof.

Robert E. Bergman, apparently, was the attorney for the family, as the result of which he became executor of the father's estate, administrator of the mother's and executor-trustee of the estate of the uncle, Harry F. L. Bunting.  On February 6, 1919, Bergman was appointed general guardian of the property of the infant.  It is not disputed that in his petition for his appointment he set forth that the sources of the infant's estates were the prospective shares of the estates of his mother and father.

He was required to give a bond for $50,100 which was furnished by the Maryland Casualty Company.  In addition thereto he was required to give another bond in the sum of $10,000, which was written by the same company, by reason of the fact that the infant's estate was increased pursuant to the provisions of the will of his uncle, Harry F. L. Bunting.

Katherine L. Bunting, the paternal grandmother of the infant, died in 1929, and she also made a will wherein she designated Robert E. Bergman as executor and trustee.

The only bonds which Bergman was required to give were those furnished in connection with the guardianship of the infant.

Pursuant to the provisions of the will of George W. Bunting, one-half of his residuary estate was given to his wife, Emma, and the other half to the infant.  The wife died intestate shortly after her husband.  This infant being the only child, all his mother's estate, which she received principally from her husband, devolved upon him.  Harry F. L. Bunting, under his will, gave one-third of the residuary estate to his mother, Katherine L. Bunting, one-third to

his brother, George W. Bunting, and one-third to the infant, his nephew. He provided that the infant's share should be held in trust during his minority and directed Bergman to expend the income and, if necessary, the principal for the education and support of the infant. The one-third which was set aside under the will for his brother, George, eventually became the property of this infant.

Under the terms of the will of the grandmother, Katherine L. Bunting, this infant was given her residuary estate to be held in trust during his minority, and Bergman, as trustee, was directed to expend the income and, if that was insufficient, the principal for the support and maintenance of the infant.

The infant attained his majority on November 5, 1938. A decree dated December 29, 1937, settling Bergman's account as guardian had been entered. Upon the petition of the infant, that decree was vacated and he filed objections to the account. He also filed objections to Bergman's account as executor of the estate of Katherine L. Bunting. In addition thereto he instituted proceedings to compel Bergman to file an account as trustee under the will of his uncle, Harry F. L. Bunting. Bergman filed this account on January 9, 1939, and later objections thereto were filed by the former infant. The record shows that Bergman died on January 27, 1939, and that his administratrix, Emma J. Bergman, was substituted in his place. The only other party who took part in the proceedings was the Maryland Casualty Company, which had written Bergman's guardianship bonds.

There does not seem to be much question about the fact that Bergman has deprived this infant of moneys which belonged to him. Apparently, from the outset, he set about systematically to defraud the infant of his property. It cannot be denied that he stole moneys which were held by him in his fiduciary capacity. The accounts he filed in the various estates were calculated to deceive the court and conceal his wrongdoing. He mingled funds which he received as fiduciary with his own except on those occasions, which were many, when he pocketed the assets. He maintained a special account, where not only his own funds were deposited, but also the funds of this infant and various other clients. He acted in successive capacities as executor, administrator, trustee and finally as general guardian.

It is unnecessary to lay one's finger on the particular estates which this infant was entitled to for the purpose of surcharging Bergman as general guardian with the different funds which should have been turned over to the infant when he became of age. All the money that he received in his different capacities in these estates belonged

to the infant and eventually should have been charged to his account as general guardian. While it is true that the corpus of the trust which the uncle, Harry F. L. Bunting, set up and also the corpus of the trust provided for by the grandmother, Katherine L. Bunting, were not to be turned over to the infant until he became of age, still the fact remains that the corpus in each estate was depleted and the moneys stolen therefrom by the accountant during the minority of the infant.

Where Bergman saw fit to act in different capacities when dealing with the property of the infant, his wrongdoing should be charged to him as general guardian since it was in that capacity ultimately that he should have handled the infant's money. Section 112 of the Surrogate's Court Act, formerly section 2582█ of the Code of Civil Procedure, provides in part as follows: " A person to whom letters are issued is liable for money or other personal property of the estate which was in his hands, or under his control, when his letters were issued, in whatever capacity it was received by him, or came under his control. Where it was received by him, or came under his control, by virtue of letters previously issued to him in the same or another capacity, an action to recover the money, or damages for failure to deliver the property, may be maintained upon both official bonds."

That section was quoted from in *Matter of Noll* (10 App. Div. 356; affd., 154 N. Y. 765). There it appeared that one Frederick Noll had acted as administrator of the estate of the father of his wards; that certain property belonging to the wards came into his hands, in the first instance, as administrator. A decree was entered directing him to deposit the sums found to be due to his wards in separate accounts as general guardian. He did not deposit them. It was argued that at the time the decree was entered he did not have the money in his hands, and that, if he had ever had them, he received them in his capacity as administrator and he had misappropriated them before his appointment as guardian. The court held, in effect, that Noll was chargeable as guardian with the amounts, to which his wards were entitled, of the assets which came to him as administrator, and that he must be deemed to hold such amounts as general guardian, and that the sureties were liable therefor. In his opinion in that case Mr. Justice BRADLEY, writing for the Appellate Division, Second Department, said in part as follows: " But where the obligation as administrator to pay, and the right and duty to receive as guardian are united in the same person, as in the present case, he becomes charged in the

latter capacity. This was the situation that arose when the surrogate's decree was perfected. And it is no objection available to the sureties on his official bond as guardian, for them to allege that prior to that time or to the time of his appointment as guardian he had misappropriated and converted to his own use the fund which came to him as administrator, and to which his wards were entitled. As he had received such fund and had not disposed of it in the administration of the estate, he, in legal contemplation, had it in his custody at the time the decree was made. And, for the purpose of the effectiveness of the obligation assumed by the sureties in his official bond as guardian, his liability to account for it conclusively charges him with having the requisite fund."

The rule which should govern a person who sees fit to act in different capacities in the manner in which Bergman did is well stated in Wait's New York Practice (Vol. 7 [4th ed.], p. 121) as follows: " A person to whom letters are issued is liable for money or other personal property of the estate which was in his hands or under his control when his letters were issued in whatever capacity it was received by him or come under his control. Where it was received by him or came under his control by virtue of letters previously issued to him in the same or another capacity, an action to recover the money or damages for failure to deliver the property may be maintained upon both official bonds."

Bergman filed his first annual inventory and account as guardian for the year 1922 and thereafter annually, with the exception of the year 1926, up to 1928. He filed no annual accounting in or for any of the six years from 1929 until December, 1935. No annual accounts were filed by him for 1935 or 1936, and it was not until May, 1937, when he was compelled to do so, that he filed his final account. As we have seen, the accounts which he filed, designed as they were to deceive, are of little aid to us in determining the exact amount which this accountant owed to his ward. It cannot be disputed that it was his duty to render full and accurate accounts of his transactions.

Mr. Justice HATCH in *White* v. *Rankin* (18 App. Div. 293; affd., 162 N. Y. 622) said in part: " The general rule of law applicable to a trustee burdens him with the duty of showing that the account which he renders and the expenditures which he claims to have made were correct, just and necessary. (*Marvin* v. *Brooks*, 94 N. Y. 71.) He is bound to keep clear and accurate accounts, and if he does not the presumptions are all against him; obscurities and doubts being resolved adversely to him. (2 Perry on Trusts, § 821.) "

Naturally, the rule as stated in that case would apply with equal force to the accounts which Bergman rendered as guardian.

Since we are of the opinion that all the funds the accountant received in any capacity should be charged to him as general guardian, we do not deem it necessary to consider his derelictions separately in connection with the accounts he rendered or should have rendered in his different capacities. He should be charged, in the first instance at least, with all the moneys which he received whether as principal from the various estates or as interest on investments. He should be credited with the amount of money he expended for the infant's maintenance and education from 1929 on together with proper legal investments such as the purchase of first mortgages and such other expenses which concededly were proper.

It is not disputed that after the death of the infant's parents, he resided with his paternal grandmother up until the time of her death in 1929. During that period she maintained, supported and educated him at her own expense. After her death the situation changed when the infant went to live with his maternal grandmother, Angelina Hoyt. The payments which the latter received from the accountant, with the exception of comparatively small amounts of cash, were made by Bergman by checks drawn on the account which he maintained in the Irving Trust Company under the title of Robert E. Bergman, special account.

He should be surcharged with interest compounded annually at the rate of six per centum on any funds belonging to the infant's estates which he, Bergman, retained for his own use. Exactly how much of the moneys he failed to deposit and stole would be a matter which the parties may be in a position to stipulate since it is well nigh impossible to get the necessary information for this computation out of the accounts on hand.

It appears that Bergman opened a bank account in the Irving Trust Company in 1922, under the title of Robert E. Bergman, guardian for George R. Bunting, with a deposit of $10,441.70. According to the record, this account was carried down to 1938. Still, it appears that during that period of sixteen years, Bergman collected $23,876.80 as interest on investments but no part of this sum was deposited in the guardian's account or even in his so-called special account. Of course, the income received by him should have been placed in the guardian's bank account. Since he failed to do so and there is nothing in the record at the present time which shows that he expended it for the benefit of the infant, he should be surcharged with compound interest on the different sums he received during that period on the theory that he used them for

his own purposes. (*Walker* v. *Walker*, 9 Wall. [76 U. S.] 743; *Matter of Kernochan*, 104 N. Y. 618.)

It is unfortunate, of course, that the accountant died prior to the time that this proceeding came on for trial in the Surrogate's Court. Fair play demands that he be given full credit for any sums of money which he expended properly on behalf of his ward.

Since we are about to order a rehearing to determine the exact amount of the surcharge, if the parties to the controversy cannot agree upon the figures, we believe it advisable to state that the surrogate properly disposed of the objections which pertained to the payment to Patterson and Patterson for legal services and payments made by the accountant for the maintenance of premises No. 665 Union avenue, Bronx, and also the premises No. 312 West Two Hundred and Sixty-first street, Bronx. In addition thereto, the surrogate properly refused to permit an amendment to the objections so as to include the item pertaining to the purchase of the mortgages.

Accordingly, unless the parties file a stipulation, the matter will be remitted to the Surrogate's Court for appropriate proceedings.

UNTERMYER, DORE and CALLAHAN, JJ., concur; MARTIN, P. J., concurs in result.

Judgment unanimously directed in accordance with opinion. Settle order on notice within twenty days from date of this decision.