## PARKS v. GATES.

(Supreme Court, Appellate Division, First Department.   June 19, 1903.)

1. CORPORATIONS — CONSOLIDATION — PROFITS — CONTRACT OF PROMOTORS —
   ABANDONMENT.
       Where plaintiff, defendant, and others contracted for the formation
   of a corporation to combine certain manufacturing corporations, and
   agreed that any profits to be derived therefrom by the promoters should
   be divided among the parties to the agreement, which also provided that
   the consolidation should be financed by M. & Co., who were authorized
   to refuse to carry out their part of the contract if they were dissatisfied
   with the profit showing of the various companies to be consolidated, and
   M. & Co. thereafter refused to proceed with the consolidation, which
   rendered it impossible of performance, such refusal constituted an aban-
   donment of the agreement, and authorized any of the parties thereto to
   make other arrangements for the consolidation without responsibility to
   others for a division of the profits accruing therefrom.

2. SAME.
       Where, after the termination of a contract for the formation of a con-
   solidated corporation by reason of the refusal of certain bankers to
   carry out their agreement to finance the scheme, it was agreed between
   plaintiff and defendant, who were parties to such agreement, that plain-
   tiff should proceed with the work and that defendant and others would
   co-operate with him, such contract only bound defendants to co-operate
   with plaintiff when his negotiations advanced to the stage of finding a
   person able and willing to finance the scheme, and did not require de-
   fendant to withhold active exertions on his part for the promotion of a
   scheme of consolidation different from that contemplated.

3. SAME—REMEDIES—BREACH OF CONTRACT—ACCOUNTING.
       Plaintiff and defendant had entered into a contract for the formation
   of a consolidated corporation, which provided that any profits arising
   therefrom should be divided among the promoters.   Such contract was
   abandoned, and defendant agreed to assist and co-operate with plaintiff
   in his further efforts to form such consolidation, but before plaintiff had
   prosecuted his efforts to a successful termination defendant formed a
   different consolidation, and it was not shown that any profits accrued
   to defendant therefrom except such as he derived as an underwriter of
   the bonds of such consolidated corporation.   *Held*, that plaintiff was not
   entitled to maintain a suit in equity against defendant for an accounting
   of profits, but was only entitled to recover, if at all, in an action for
   breach of contract.

4. SAME—DAMAGES.
       Plaintiff and defendant contracted for the formation of a consolidated
   corporation, and after the contract had been abandoned, and defendant
   had agreed to co-operate with plaintiff in his subsequent efforts to form
   such consolidation, defendant formed a different consolidation than that
   contemplated, from which it was not shown that no profits were derived.
   Two years later another consolidation like that contemplated by the
   original contract was formed, to which plaintiff was not a party, and
   from which profits accrued to defendant.   *Held*, that such profits were
   too remote to be recoverable under such prior agreement.

Appeal from Special Term, New York County.

Action by John H. Parks against John W. Gates.   From a judg-
ment in favor of defendant, plaintiff appeals.   Affirmed.

Argued before HATCH, McLAUGHLIN, O'BRIEN, INGRA-
HAM, and LAUGHLIN, JJ.

Austen G. Fox, for appellant.
William D. Guthrie, for respondent.

HATCH, J.   The plaintiff brought this action upon an agreement made and entered into on the 13th day of September, 1897, by and between E. H. Gary, for himself and his associates, as party of the first part, and G. H. Ten Broeck, representing himself and his associates, as party of the second part.   Among other things, the agreement provides:

"That for and in consideration of the mutual promises and obligations herein entered into and the expenses incurred and to be incurred by the parties hereto, said parties agree among themselves to bring about, if possible, by their individual and united efforts the formation of a corporation and the purchase by said corporation of wire, rod, barb wire and wire nail manufactories of the United States or elsewhere; each individual party hereto obligates and pledges himself to the others to make every effort in whatever capacity he may be able to use his efforts to bring about the results contemplated by this agreement * * * any profits, gains or compensation of any sort which may accrue to any of the parties hereto or all of them, whether in cash or securities or stock of the proposed corporation or in whatever form such profits, gains and compensation may be, are to be pooled and placed in the hands of J. P. Morgan & Co., who is to act as trustee and treasurer for the joint interests of the parties hereto in this transaction."

The agreement further provided for the payment of expenses incurred in and about promoting the consolidation out of the profits of the enterprise, and, after payment of expenses, "all profits of any kind remaining * * * are to be divided into two equal shares, the said parties of the first part receiving for himself and associates one share or half, and the second party for himself and associates receiving one share or half," such division being full compensation for all services rendered in carrying out the purposes of the agreement by any one of the individual parties thereto, and to constitute a full release of all obligations of each to any or all of the others.   The agreement further provided that in estimating or calculating profits or gains there was not to be included any consideration or bonus paid to any of the parties as part of the purchase price for any property sold or turned over by him or them to the proposed corporation, nor was there to be included any amounts paid for legal services rendered by any of the parties thereto and properly chargeable to the proposed corporation.

The complaint avers that this agreement was duly carried out and performed, and that a corporation was duly organized, as provided thereby, under the name of the American Steel & Wire Company, and that plaintiff did and performed much work and labor in and about the formation of such corporation, and contributed his just share of the expenses incurred therein, that large gains and profits, amounting to several million dollars, were realized out of the formation of such corporation; but that the defendant has never accounted nor paid over any part of the same to the plaintiff or any other person, but has retained the same for his own benefit; that the defendant has made some arrangement or settlement with all the other individuals entitled to share in the profits of the venture, except the plaintiff, and that they have relinquished, or accepted payment in satisfaction of, their rights to participate in the profits, and that the plaintiff is the only person entitled to share therein.   The complaint demands judgment that an account be taken of all gains and profits

received or realized by the defendant; that the defendant pay over to this plaintiff the proportionate share of such gains and profits due to him under the agreement; and for the costs of the action.

The defendant for answer, among other things, denies that the said agreement was carried out or performed, alleges that the same was abandoned by the parties thereto, and denies that the American Steel & Wire Company acquired all the property, real or personal, of the corporation intended by said agreement. The answer further avers that no profits were made in the transaction, and denies all the other averments of the complaint.

It appeared upon the trial that Ten Broeck and four others had been engaged for some time in attempting to establish a combination of the industries mentioned in the agreement, that the plaintiff had also been working independently for some time along the same lines, and that on the 10th day of September, 1897, he was admitted into association with Ten Broeck and his associates, under an agreement that he should have an equal share with the others in whatever profits were made. This arrangement provided that the proposed consolidation must be effected on or before March 1, 1898. The defendant, in connection with Gary, had been engaged in the steel and wire business for some years, and they had also been engaged in attempting to form a similar combination. Under these circumstances the respective parties met in the city of New York, and, after negotiations, the contract which is the subject of this action was made and entered into. On the 23d day of September, 1897, Gary and Ten Broeck, on behalf of themselves and their associates, entered into an agreement with J. P. Morgan & Co. for financing the scheme. This agreement recited 14 different companies which it was proposed to consolidate into a single corporation, to be organized with a capital stock of $75,000,000, divided into 750,000 shares of $100 each, of which 300,000 shares were to be 7 per cent. cumulative preferred stock, and 450,000 shares were to be common stock. J. P. Morgan & Co. were to endeavor to form a syndicate to provide $20,000,000 in cash to meet the contemplated money requirements in the purchase of the properties. Gary and Ten Broeck were to retain $15,000,000 of the common stock, of which they were to deliver $7,500,000 to J. P. Morgan & Co. as compensation for their services in financing the scheme, and the remainder was to be divided between Gary and Ten Broeck and their associates in accordance with the terms of their agreement. It was further stipulated by J. P. Morgan & Co. that all of the properties upon which options were to be obtained should be submitted to them for their inspection, or to an expert, selected by them, for examination, and they reserved the right of their own volition to refuse to carry out the terms of the contract, or be bound thereby, either morally or legally, if upon such investigation they deemed it unsatisfactory. Following this agreement, numerous options were obtained and submitted to J. P. Morgan & Co., and considerable expense was incurred in and about procuring the same by the plaintiff and his associates, and by J. P. Morgan & Co. in and about investigating the affairs of the respective companies which had given the options. Some of these options were obtained

by the plaintiff and his associates, and some by the defendant. The result of the examination of the properties on behalf of J. P. Morgan & Co. proved for several reasons not to be satisfactory to them, and, based thereon, they refused to have any further connection with the enterprise, abandoned the same, and notified Gary and Ten Broeck of such determination. Of such action upon the part of J. P. Morgan & Co. the plaintiff was notified at or about the time that such determination was announced. Upon this subject the court found that the agreement, the subject of the action, was made in contemplation of the promotion of the corporation therein provided for by J. P. Morgan & Co., and that it was dependent upon the acceptance of certain options from independent manufactories, expiring on or about March 1, 1898; that on or about February 15, 1898, J. P. Morgan & Co., "being dissatisfied with the reports made by the chartered accountants who had investigated the profit showing of the various companies, and influenced by the depression in the money market due to disturbances between the government of the United States and the government of Spain, declined to proceed with the consolidation. The withdrawal of the said bankers, in a letter under date of February 26, 1898, was conveyed to the manufacturers, who thereupon refused to extend their options or to go on with the proposed consolidation. The contents of the said letter were communicated to the plaintiff in this action, who acquiesced in the mutual understanding between all parties that the consolidation in the proposed form should be and was abandoned."

It is insisted by the appellant that this finding was without sufficient evidence to sustain it, and that, upon the contrary, it appears that the scheme was never abandoned. It is evident that all of the associates in the Gary and Ten Broeck agreement understood that the scheme of consolidation which was proposed therein could not be accomplished unless there could be enlisted some person, corporation, or company of sufficient financial ability to furnish the funds needed to consummate the same. Such necessity was the subject of conversation prior to the execution of their agreement, and in the agreement it is recited that the profits and gains and compensation were "to be pooled and placed in the hands of J. P. Morgan & Co. as trustee and treasurer for the joint interests of the parties hereto in this transaction." This was followed by the execution of the Morgan agreement, and it is undisputed that the plaintiff and his associates relied upon the fulfillment of that agreement in order to carry out the scheme. It is also undisputed that Morgan & Co. refused to proceed with the scheme after examination had been made of the manufactories submitted to them under the options. It is established, therefore, as an undisputed fact, that the contract, so far as J. P. Morgan & Co. were concerned, was abandoned. It was testified by the witness Gary that on the same day, or the next, when the letter was received from J. P. Morgan & Co. announcing their withdrawal from the scheme, a meeting was held, which was attended by the defendant and Gary and a large number of the manufacturers who had given options on their respective plants; that at

such meeting the withdrawal of Morgan & Co. was discussed, and the suggestion made that the manufacturers extend their options for a few months, as had been suggested in the letter from Morgan & Co. The subject was debated by those present, and many of the manufacturers spoke in opposition thereto, stating that they had depended upon Morgan & Co. for the success of the scheme, and their withdrawal ended it so far as they were concerned. This was a meeting of the wire manufacturers, and no manufacturer then present expressed a willingness to extend any of the existing options. Ten Broeck and the plaintiff were not in the room at the time this meeting was held, but both had seen and read the letter from Morgan & Co. The general expression was that the scheme was abandoned, as it could not be made to succeed on account of the withdrawal of Morgan & Co. This witness is corroborated by all the other witnesses for the defendant who testified upon the subject. The plaintiff was interrogated upon this subject, and testified that he never saw the contents of the letter, but that Ten Broeck, towards the end of February, informed him that the Morgans had declined to go on with the business. He further testified that after the meeting, which the witness placed in March, at which the defendant and others were present, it was stated that the whole deal was off; that Mr. Gates and Mr. Gary were going back to Chicago; that the common expression was that "the jig was up"; and that by this expression the plaintiff understood that the deal was off with Morgan, and that he would not finance the scheme.

There is no evidence in the case which in the slightest degree disputes the testimony that, after the reception of the letter from Morgan & Co., a meeting was held by a large number, if not all, of the manufacturers who had given options; that they refused further to extend the same; and that Ten Broeck and the plaintiff were informed of this meeting and of its results. It cannot be doubted but that, if the parties had separated at that time with the statement that the scheme was abandoned, and no further negotiations were had respecting the subject-matter, in legal effect the contract would be terminated and the enterprise abandoned. There was nothing in the contract which provided that the negotiations should continue for any specified period of time. There was a limitation to the 1st of March, 1898, in the contract between Ten Broeck, the plaintiff, and their associates, and that time expired before the contract with Morgan & Co. was canceled; but the agreement under which the plaintiff claims had no time limit. The parties thereto were undoubtedly bound to carry out its terms and conditions in good faith, and could not arbitrarily annul or abandon the same; but when that part of the scheme failed which was absolutely essential to its successful prosecution, and nothing was then in sight from which it could be reasonably inferred that the scheme could be prosecuted to a successful issue by the use of other means, no legal obstacle stood in the way of any party thereto withdrawing from the same, and, acting in good faith in so withdrawing, he would be untrammeled in prosecuting the enterprise in any form or manner which he chose. More-

over, he could avail himself, under such circumstances, of the efforts which had been put forth by his associates in the enterprise, and he could have received substantial benefits therefrom without infringing any legal rule or being guilty of any moral breach. In principle, such a condition is not other or different from the relation existing between a principal and a broker employed to sell or purchase property, and the reasoning of Judge Finch in Sibbald v. The Bethlehem Iron Co., 83 N. Y. 378, 38 Am. Rep. 441, finds direct and pertinent application. The relation which existed between these parties was not that of copartners; and while undoubtedly it partook of that relation, and therefore became subject to the rule requiring absolute good faith in dealing, yet, if the scheme was abandoned, and had proven abortive by reason of existing conditions, the parties were remitted to their former condition, and no obligation would then exist by one towards the other respecting their subsequent action. Schantz v. Oakman, 163 N. Y. 148, 57 N. E. 288. The obligation of good faith which was owed by the defendant related to the fulfillment of this contract. Such obligation ceased the moment the contract was abandoned by the parties thereto, and thenceforth they stood toward each other as strangers, as though the agreement had never been, and each might freely avail himself of any benefits resulting from the negotiations which had been had, and the conditions which had been produced, under the abandoned contract. It is evident, therefore, that not only is the finding of the court sustained, but it is supported by undisputed proof. The defendant, therefore, had the right thereafter to make any consolidation, or form any corporation, which he pleased, without liability to any party to the agreement. Upon the proof as it stands, no other associates in the contract could by any possibility have any claim upon the defendant under the terms of the agreement, the subject of the action. All treated it as abandoned, and all ceased any efforts thereunder.

Unless the plaintiff, therefore, by reason of his subsequent negotiations with the defendant, kept the contract alive between them, and continued the obligation which the defendant had assumed to him, no liability is established. The plaintiff claims that such was the fact, in consequence of which, as between himself and the defendant, the contract remained and continued, and the acts of the defendant in what he did, subsequently, inured to the plaintiff's benefit. This is based upon the conversation which the plaintiff had with the defendant after the meeting at which the claimed abandonment took place, and is contained in substance in these words:

"Q. Who used the expression, 'the jig was up,' do you remember? A. It was a common expression that it was off, that the whole deal was off, and Mr. Gates and Mr. Gary were going back to Chicago; and I asked at that meeting if I might undertake the matter here with some of my financial friends, Mr. Rogers and others, and they said that was all right, to go ahead; they did not believe that I could do it, but I had the right to do it; they would co-operate."

It is noticeable in this statement that the plaintiff recognized that the deal was off and the contract abandoned. He asked that he be

permitted to go on, with their co-operation. It is evident from the testimony that the word "they," to which .the plaintiff refers, was limited to the defendant, and possibly may have embraced Gary'. There is no pretense even, upon the part of the plaintiff, that he assumed to continue any further negotiations looking to the fulfillment of the contract with Ten Broeck or with his associates, except as ·appears from a conversation he had with Mr. Chisholm; but he did not claim this was binding upon any one but the defendant; every person dropped out of the contract in the negotiations,· except defendant and Gary. This statement upon the part of the plaintiff amounted, if anything, to a new agreement with the defendant. It was so indefinite in terms that it could mean no one else. The terms and conditions of the old contract could not be fulfilled, for the rea- ·son that it· contemplated the co-operation of Morgan & Co., and they ·confessedly had dropped it. The plaintiff was to attempt to· substi- ·tute Mr. Rogers or some one else. The telegrams and other correspondence subsequent to this conversation were all with Gates, and all give encouraging reports of what plaintiff hoped to accomplish, and what he asked the defendant to do. The evidence is undisputed that the plaintiff did not enlist Mr. Rogers in the enterprise, nor any ·other financier of ability sufficient to finance the scheme; nor do any of his communications state that he at any time had anybody who could carry this branch of the scheme through. The most that is disclosed by the record is that the plaintiff was hopeful of doing and accomplishing what the agreement originally contemplated; but in actual results it was as abortive as was the first contract.

We think the effect of this testimony in its entirety, giving the plaintiff the full benefit of all he sought and hoped for, constituted no more than the expression of a willingness upon the part of the defendants to co-operate with the plaintiff at any time when he had advanced his negotiations so far as to find a person who would finance the scheme. It certainly cannot be construed as a binding agreement upon the part of the defendant to withhold active exertions on his own part in the promotion of any scheme in which he saw fit to engage. Acting in good faith, he was as free to negotiate, either alone or in association with others, as he would have been had there never been any agreement between the parties.

Assuming, however, that the testimony of the plaintiff was sufficient to establish a binding continuation of the old contract with the defendant Gates, it was perfectly competent for the court, under the evidence, to find that such contract was not continued. At the most, the evidence presented a question of fact for the court's determination. The whole of the testimony is quite as consistent with an agreement to aid in any subsequent negotiations when the plaintiff had produced a condition and a party with whom the contract could be made, as that the contract was continued in full force. Confessedly, the plaintiff never reached this stage at any time, and nothing certainly appears showing that he ever would. It is to be borne in mind that this is an action to enforce. an agreement, and to have an

accounting of the profits thereunder. Confessedly, nothing was done under that agreement by the plaintiff, for the proof upon the part of the plaintiff shows that an entirely different arrangement, between different parties, based upon different terms, and subject to very different conditions, was made by the defendant. Consequently there would be nothing thereunder upon which an accounting could be had. The only liability which could attach under such circumstances would be for damages occasioned by a breach of the contract; an equitable action for an accounting would not lie. Schantz v. Oakman, supra; Lee v. Washburn, 80 App. Div. 410, 80 N. Y. Supp. 1040. Upon this branch of the case, therefore, we conclude that the finding of the court is sustained by the evidence, and that in any event an equitable action for an accounting cannot be maintained.

There is, however, another, and, we think, a complete, answer to the claim of the plaintiff. It appears that while on the way to Chicago, after the abandonment of the contract, the defendant and others discussed the possibility of forming a combination of certain companies in the state of Illinois. These negotiations were continued somewhat actively, and resulted in the formation of the American Steel & Wire Company of Illinois, made up of 5 of the 14 companies mentioned in the Morgan agreement. It is undisputed that no bonus was paid to any one in and about the formation of this corporation, nor were any promotion profits derived therefrom. The defendant contributed his holdings of stock in the company of which he was president, which entered into the combination, and received, in the distribution in lieu thereof, stock in the new concern. He was an underwriter of its securities, and in whatever profits he made in that capacity the plaintiff was not entitled to share, as they were never covered by any agreement. The case is utterly destitute of any proof showing that any profits were made by that combination. The incorporation of the American Steel & Wire Company in New Jersey followed in January, 1899. It is not shown that any profits were made by the promoters in that corporation, or that it otherwise made any. It appeared that this latter corporation was financed by Seligman & Co. At the close of the trial, the plaintiff's counsel stated:

"I have subpœnaed a gentleman, Mr. Strauss, of the firm of Seligman & Company, not as to any fact going to the existence of the equitable cause of action, but to the extent to which the court will, through a referee or in any way it may seem proper, follow up the profits, and ascertain the extent of the profits in which the plaintiff is entitled to share."

If the counsel were held to a strict literal interpretation of the language used by him, it would result in a holding that the testimony of this witness was entirely immaterial, as his express statement is that he did not purpose to prove any facts by him to establish his equitable cause of action. We think, however, that the counsel did not mean exactly what he said, and that he meant that the witness would not testify to any facts tending to establish the existence of the contract and the defendant's breach of the same, but, so far as profits were essential to be established as a part of his equitable cause of action, he offered the proof for that purpose. It remains, how-

ever, as the fact, that it was not established between the covers of the record in this case that any profits arose out of this venture.

The question thus presented is the same in principle, although the reverse in fact, of the question presented in Schantz v. Oakman, supra. There the question arose upon demurrer to the complaint, in an equitable action for an accounting, which averred a scheme quite similar to the one now under consideration. It was held bad for the reason that there was no averment that profits were made while the parties were working in combination, or that defendants had been intrusted with any of plaintiff's money or property for which they were required to account. In the present case, the complaint avers the transaction in which the defendant engaged, and for which he was sought to be called upon to account, which he has retained for his own benefit. There is no averment that the defendant received or had any of the property of the plaintiff for which he is bound to account; that element, therefore, is out of the case. While the averment of the complaint as to profits earned is sufficient, there is an entire absence of proof of any profits which arose out of the corporations which were formed through the instrumentality of the defendant. The case is therefore decisive of the proposition that, in order to maintain an equitable action for an accounting, the plaintiff must aver and prove as a part of his affirmative cause of action the existence of such profits, else he fails to show a case entitling him to equitable relief. Such, in effect, was our former decision. Parks v. Gates, 54 App. Div. 512, 66 N. Y. Supp. 1034. See, also, Safety Elec. Cons. Co. v. Creamer, 84 Hun, 570, 33 N. Y. Supp. 411; Salter v. Ham, 31 N. Y. 321. The evidence in the case which seeks to fix liability upon the defendant for the profits earned in the formation of the New Jersey corporation is so remote from the agreement which was entered into, and occurred so long after all the options which the plaintiff had procured (or which had been procured at the time the conversation was had between the plaintiff and defendant) had expired, that we think no basis exists upon which an accounting could be asked for in that transaction, even though profits were made. Certainly the hands of the defendant were not tied forever by the arrangement which had existed between the plaintiff and him. The formation of the New Jersey corporation was nearly two years after the abandonment of the agreement sued on. It was formed by different agencies and combinations, and while, undoubtedly, the formation of the Illinois corporation aided largely in the subsequently successful combination, yet we think it was not a necessary consequence of it, assuming the plaintiff to be entitled to recover such damage as he sustained by reason of the formation of the first corporation; but however this may be, it is sufficient now to say that the finding of the court that the contract was abandoned is abundantly sustained by the testimony. If the plaintiff have any remedy, it is not an equitable action for an accounting, but is a legal action to recover damages for a breach of the contract. No equitable cause of action is established in this case, for the reason that no profits have been shown to have been earned or made under any agreement, and proof

of the existence of profits is essential to the maintenance of such an action.

It follows that the judgment should be affirmed with costs. All concur.