facts as they come to it, and, as suits its judgment, will compel him to reject all bids, or to accept the lowest bid. Thus the court would be substituted to exercise the power granted by statute to the president of the borough, if it deems the officer morally disqualified or errant in political ethics. In brief, the court would qualify itself for discharging a statutory duty placed upon an official by disqualifying him by reason of perverse motive. An attentive study of the decisions fails to discover such prerogative of the court, based upon the moral feebleness or degeneracy of the person to whom the statute consigns the welfare of the city in the matter under consideration. If, now, the evidence of bad faith by the president of the borough be sought in the papers, it is tendered by the relator's information and belief that his competitor in bidding, or some third person, has uttered something which is imputable to the president of the borough, although that officer was not privy to the statement or responsible for the words of the speaker. It is shown that the president of the borough did not reject the bids until January 30, 1915, when nearly a twelfth of the year during which the service should have been rendered had expired. That would seem to need explanation, but it should be made to whomsoever the president is amenable. No good purpose would be subserved by making it to the court, as it has no power to take cognizance of it in the present proceeding.

The order should be reversed, with $10 costs and disbursements, and the motion denied, with $10 costs. All concur.

---

PIERCE v. McDONALD.   (No. 7372.)

(Supreme Court, Appellate Division, First Department.   June 4, 1915.)

1. JOINT ADVENTURES ⊂⇒1—WHAT CONSTITUTES—SHARING IN PROFITS.

That certain persons contribute to a fund to be deposited with a municipal corporation as security for a bid to build a subway does not make them joint adventurers, where they render no services, have no voice in the making of the contract or in its performance, but are merely to share in the profits.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. § 1; Dec. Dig. ⊂⇒1.]

2. JOINT ADVENTURES ⊂⇒5—ACCOUNTING—BURDEN OF PROOF.

Plaintiff made a contribution to a fund to secure a bid to a municipal corporation to construct a subway, for which he was to receive part of the profits in case the bid was accepted, as was the case. Subsequently a construction company was formed to do the work, and plaintiff was given stock therein. Upon the death of the contractor, plaintiff brought an action for an accounting with respect to profits. Held, that the burden rested upon plaintiff to show that there remained profits in which he was entitled to share and which had not been divided.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. § 7; Dec. Dig. ⊂⇒5.]

Appeal from Special Term, New York County.

Action by John Pierce against Georgie Annie McDonald, as executor under the will of John B. McDonald, deceased. From a judgment for defendant, plaintiff appeals. Affirmed.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-LIN, DOWLING, and HOTCHKISS, JJ.

Edward W. Hatch, of New York City (William M. Parke, of New York City, on the brief), for appellant.

Charles E. Rushmore, of New York City, for respondent.

LAUGHLIN, J. This is an action against the executrix of John B. McDonald, deceased, for an accounting with respect to his profits under a contract between him and the city of New York for the construction of the original subway for the transportation of passengers, and it is based upon a parol agreement alleged to have been made between the plaintiff and McDonald, by which the plaintiff advanced to McDonald the sum of $30,000 to make up a fund of $150,000 which was required to be deposited in cash with a proposal for the work, upon an agreement by him to return it to plaintiff if it should not be forfeited to the city, and to give the plaintiff, as compensation for advancing the money and for the risk of forfeiture thereof, a one-fifth interest in the net profits received by McDonald.

McDonald died on the 17th day of March, 1911, and this action was commenced on the 28th day of January, 1912. The trial court found that the only cause of action established in favor of the plaintiff was one at law, and that it was barred by the statute of limitations, which was duly pleaded. The learned counsel for the plaintiff does not question the correctness of the decision, if the plaintiff had only a cause of action at law for his share of the profits, or for an amount equal thereto; but it is contended that, by virtue of the agreement, the bid and contract became a joint adventure between the plaintiff and others who similarly contributed to the fund and McDonald, and that plaintiff became the equitable owner of one-fifth of the profits, and that in making the bid and conducting the enterprise McDonald became in effect the agent or trustee for, and assumed a fiduciary relation toward, the plaintiff and the others similarly situated, which gave plaintiff an absolute right to a full accounting, notwithstanding the fact that he and the others similarly situated received and accepted a portion of the profits, which at the time they supposed was all they were entitled to receive, and without regard to whether there is evidence that there remained other profits undistributed.

It was evidently assumed on the trial that any testimony offered by the plaintiff with respect to a personal transaction with the decedent would be objected to and excluded as incompetent, for he was not called as a witness. It was shown, however, that on the 12th day of January, 1900, a check drawn by the plaintiff for $15,000 to his own order and indorsed by him in blank, and another check drawn by a corporation, with which he was identified, to the order of McDonald, were indorsed by McDonald, and the proceeds used to make up the cash deposit of $150,000 accompanying McDonald's bid. The contract for the construction of the subway was awarded to McDonald some time prior to January 20, 1900, and on that day he assigned the fund thus deposited to August Belmont & Co. as security for their undertaking to deposit $1,000,000 with the city as security for the performance of the contract.

and to aid in financing it. On the 19th of February, 1900, McDonald formally assigned in writing a 5 per cent. interest in his profits to August Belmont as compensation for the organization by the latter of a construction company for the construction of the subway and the furnishing of said cash deposit of $1,000,000. Mr. Belmont, pursuant to his agreement, organized the Rapid Transit Subway Construction Company and on the 21st of February, 1900, McDonald entered into an agreement with it, by which it agreed to furnish the $1,000,000 cash deposit and to execute as surety, or to procure sureties to execute, bonds required by the city, aggregating $6,000,000, for McDonald's faithful performance of the contract with the city, and he assigned to it all payments to be made by the city under the contract, and agreed that he would not sublet any part of the work or purchase any materials without its approval, and that he would also assign to it the lease for the operation of the road which the city was to execute to him; and it agreed to distribute the surplus of the moneys received by it from the city, over and above the amount necessary to pay for the construction, in accordance with another agreement between the same parties bearing the same date, which provided that the Construction Company should retain 75 per cent. of the net profits for its services and pay the remaining 25 per cent. thereof to McDonald; and the agreement contained provisions for determining the profits on the lease which were also included. It was stipulated that these two contracts superseded the contract of January 20, 1900, with August Belmont & Co. The fund of $150,000 deposited by McDonald with his bid was released, and the plaintiff and the other contributors thereto received back the amounts they contributed.

There is no evidence of any express agreement by McDonald *to assign* any interest in the profits to plaintiff. On the day McDonald made the contracts with the Construction Company, he executed participation certificates, by which he undertook to divide the 20 per cent. of the net profits which he was to receive from the Construction Company, after the deduction of the 75 per cent. which it was to receive and the 5 per cent. which he had assigned to August Belmont; and he thereby gave to August Belmont $2/21$, to Andrew Freedman $5/21$, to C. W. Morse $2/21$, to Cornelius Vanderbilt $1/21$, to Perry Belmont $1/21$, to Harry G. Runkle, who contributed $15,000, $1/21$, to Howard Carroll, who contributed $15,000, $1/21$, to plaintiff $2/21$, and he executed a certificate to himself for $6/21$. These certificates, pursuant to separate identical agreements dated December 16, 1901, made by the holders thereof, which recited that they were made between McDonald *and his associates*, who it was also recited *were interested in 25 per cent. of the profits*, and Belmont & Co., were exchanged for certificates issued by Belmont & Co., which entitled the holders thereof to a specified number of shares of 25,000 shares of the stock of the operating company when issued; it being recited in those agreements that 25,000 shares of the capital stock of the operating company were to be issued on account of the 25 per cent. of the profits to which McDonald *and his associates* were entitled. The operating company was formed, and the plaintiff and the other certificate hold-

ers received stock thereof, in accordance with their respective certificates. The certificate issued to August Belmont was not for the one-fifth of the profits which McDonald had assigned to him and the $^2/_{21}$ of the 20 per cent. of the profits represented by the McDonald certificate, but for said $^2/_{21}$ and one-half of the 5 per cent., as shown by the agreement of December 16, 1901, signed by him, and the certificate issued to McDonald was for 6,965 shares, being the number called for by the agreement of December 16, 1901, signed by him, the percentage not being specified, but a computation shows that it equals the allotment for said $^6/_{21}$ and one-fourth of 5 per cent., and that issued to Andrew Freedman, as shown by his agreement of December 16, 1901, was for one-fourth of 5 per cent. in addition to his McDonald certificate for $^5/_{21}$ of twenty per cent.; but neither the contracts nor the certificates show why this was done. There is nothing to show or indicate on what theory Belmont & Co. included in the participation certificate issued to Freedman an interest representing a one-fourth of 5 per cent. of the profits, except that his interest was so stated in the contract of December 16, 1901, signed by him, and it does not appear how he acquired such interest. With respect to McDonald, however, it appears that a letter was written by August Belmont to him *under date* of February 20, 1900, which is the day after McDonald assigned the 5 per cent. of the profits to him, as follows:

"Referring to the agreement made with you under this date by which you are to pay to me one-fifth ($^1/_5$) of the twenty-five (25) per cent. of the profits of the Rapid Transit construction contract coming to you under the contract of February 21, 1900, with the Rapid Transit Subway Construction Company, I hereby agree to return to you one-quarter ($^1/_4$) of said one-fifth ($^1/_5$) when the same has been paid to me."

This letter bears the following indorsement:

"I hereby assign the above to

"[Signed]    John B. McDonald.

"Dated December 24, 1901."

This is the only evidence tending to explain how Belmont & Co. came to issue a participation certificate to McDonald for more than $^6/_{21}$ of the 20 per cent., and it is argued therefrom that by the indorsement McDonald surrendered the letter, and that the ¼ of the 5 per cent. of the profits was included in his certificate in accordance therewith. It was stipulated on the trial that McDonald and his associates were also given the privilege of subscribing for other stock of the operating company at par, and that plaintiff availed himself of that privilege. It appears that the stock was worth double its par value within a couple of years after it was issued. The plaintiff received 1,905 shares of the stock of the operating company on account of his $^2/_{21}$ of the 20 per cent. of the profits; but it does not appear how much he took at par in addition thereto.

In opening the case, Mr. Levy, of counsel for plaintiff, stated that plaintiff's claim was that each of McDonald's friends who advanced $15,000 was to receive one-seventh of the ultimate profits received by McDonald, and that on that basis plaintiff was entitled to two-

sevenths; and he conceded that it was recognized that there would be disbursements for bankers' services and otherwise that McDonald would have to make, and that the profits that were to be divided were what would be left after such disbursements were made. The theory on which the one-seventh for each $15,000 was claimed was that McDonald himself was to put up $30,000, plaintiff $30,000, Runkle $30,000, and Carroll $15,000, making $105,000; but it appears that Andrew Freedman advanced $45,000, and Runkle only advanced $15,-000 and the claim to one-seventh has been abandoned, and it is claimed now that the division of the net profits was to be made in the proportion of one-tenth for each $15,000 of the fund of $150,000.

A question arose on the trial with respect to the competency of the testimony of Runkle and Carroll with respect to interviews with McDonald, and the testimony was received over objection as to its competency under section 829 of the Code of Civil Procedure, subject to a motion to strike it out to be made in the brief to be submitted. No ruling appears to have been made by the trial court with respect to such motion, and in the opinion of the court the question was deemed immaterial, on the ground that without it the documentary evidence shows an agreement between McDonald and the contributors to divide his profits in the proportion of one-tenth for each $15,000 advanced. The court arrived at this conclusion on the theory that the participation certificates issued to the Belmonts, Freedman, Morse, and Vanderbilt were for bankers' services, which, however, is not shown by the certificates, or otherwise than by McDonald's statement to that effect to Runkle, and that the remaining $^{10}/_{21}$ were divided in the proportion of one-tenth for each $15,000 advanced; McDonald evidently taking his certificate for the amount contributed by him and the amount advanced by Freedman, and the other $15,000 not advanced by Runkle, which evidently was also advanced by McDonald, or by another friend of his. There is no evidence showing who composed the firm of Belmont & Co.

I am of opinion that the documentary evidence *does not show the agreement* made between McDonald and his friends who contributed to the cash deposit of $150,000, and that if the case rested on that evidence there would be a complete failure of proof showing, or tending to show, that the contributors were entitled to any more than the shares they received by the participation certificates issued by McDonald. If the plaintiff had a cause of action at law, it is clear that it would be competent for the other contributors to testify to interviews with McDonald tending to sustain such cause of action, for they never were and could in no manner be interested in such cause of action. The suit, however, is in equity, and it has been brought on the theory that each contributor had a separate cause of action for an accounting for his share of the profits. If that be so, it is equally clear that it was competent for other contributors to testify to sustain the plaintiff's cause of action, for on that theory they never were, and could not be, interested in his cause of action. If this action were for the benefit of Runkle and Carroll, or could in any manner inure to their benefit, it is quite clear that they would be incompetent to testify to personal

transactions with McDonald tending to sustain it; but it is not contended that they are necessary parties, or entitled to be brought in, and it has not even been suggested that they be brought in. No action has been brought by Runkle, and it is quite clear that the statute of limitations has run against any right of action in his favor. It appears that a similar action was brought by Carroll on the 8th of November, 1912, and that it was pending when this action was tried.

The evidence tends to show that the fund was distributed in 1902, and it is probable that the statute of limitations has run against Carroll's action. In order to remove as far as possible any objection to the competency of Carroll as a witness, he expressly waived any right to have his testimony used in his own behalf. As already observed, the testimony of Runkle and Carroll is in the case without any ruling on the motion to strike it out, and we will assume, therefore, that for the purposes of this appeal plaintiff is entitled to the full benefit of it without ruling on its competency. Each of them testified in substance that McDonald agreed that the profits should be divided into tenths, and that each contributor should receive one-tenth thereof for each $15,000 advanced. Carroll further testified with respect to an interview with McDonald after the distribution, from which it is claimed McDonald conceded that the contributors would receive something more; but this is not the effect of his testimony. Runkle also testified that when he received his participation certificate he complained to McDonald that it did not represent one-tenth of the profits, and that McDonald replied that the bankers had taken the rest. This statement made by McDonald to Runkle, together with the admission made by Mr. Levy in opening the case, is all that is shown by the record to account for the 20 per cent. of the profits not having been divided in the proportion of one-tenth to each contributor of $15,000.

[1] It is quite clear that McDonald and his friends who contributed to the fund of $150,000 under the agreement as shown by the testimony of Runkle did not become partners; and I am of opinion that they did not become joint adventurers, for the contributors had no interest in the enterprise, other than to receive a share in the net profits, or an amount equal to a percentage thereof. They were to render no services, and they were to have no voice in making the contract or in the performance thereof. So far as they were concerned, the enterprise was McDonald's, and his only. They risked the money they advanced to him on his agreement to divide his profits with them; but the profits were to be his, not theirs. It was not intended that the money they advanced was to continue in the enterprise. It would have been forfeited at the election of the city, if the contract had been awarded to McDonald and he had failed to execute and to give the security required by the city on its execution; on his making the contract and furnishing the security required, the money would be released, and it was doubtless expected that it would be returned to them, as it was. It may be that they would have been entitled to an accounting for the moneys which McDonald received from them (Marvin v. Brooks, 94 N. Y. 71); but concededly they have had that, and, while it is true that they had confidence in and trusted their friend McDonald, he did

not in the execution of the contract, or in negotiating an assignment thereof, assume a fiduciary relation toward them. He did not become a trustee for them, or their agent, even if their agreement with him constituted them equitable owners of a percentage of the profits, when earned and received by McDonald, which is doubtful, and that they merely became entitled to recover from him their respective proportionate shares of the profits received by him, or an amount equal thereto, but not to an accounting. Schantz v. Oakman, 163 N. Y. 148, 57 N. E. 288; Smith v. Bodine, 74 N. Y. 30; Everett v. De Fontaine, 78 App. Div. 219, 79 N. Y. Supp. 692; Hart v. Garrett Co., 87 App. Div. 536, 84 N. Y. Supp. 774; Stewart v. Auerbach, 148 App. Div. 222, 132 N. Y. Supp. 1021; Freeman v. Miller, 157 App. Div. 715, 142 N. Y. Supp. 797.

A different rule has frequently been applied where money or property is invested, or services are rendered, in an enterprise, in which the parties are to share the profits which accrue from the investment of the money or property or the rendition of the services; but in all those cases there was a joint interest in the enterprise. See Valdes v. Larrinaga, 233 U. S. 705, 34 Sup. Ct. 705, 58 L. Ed. 1163; Marston v. Gould, 69 N. Y. 220; Marvin v. Brooks, supra; Hill v. Curtis, 154 App. Div. 662, 139 N. Y. Supp. 428; China & Japan Trading Co. v. Provand, 155 App. Div. 171, 140 N. Y. Supp. 79; Weldon v. Brown, 84 App. Div. 482, 82 N. Y. Supp. 1051; Rice v. Peters, 128 App. Div. 776, 113 N. Y. Supp. 40; Haight v. H. & F. Co., 46 Misc. Rep. 501, 92 N. Y. Supp. 934, affirmed 112 App. Div. 475, 98 N. Y. Supp. 471, affirmed 190 N. Y. 540, 83 N. E. 1126; Jordan v. Underhill, 91 App. Div. 124, 86 N. Y. Supp. 620; Frethey v. Durant, 24 App. Div. 58, 48 N. Y. Supp. 839; Id., 44 App. Div. 381, 16 N. Y. Supp. 15.

[2] If, however, the agreement, without creating a fiduciary relation between the contributors and McDonald, entitled the former to an accounting on the theory that they had an interest in the profits as such, still I am of opinion that the plaintiff was not entitled to recover. When the plaintiff received from McDonald the participation certificate for $2/21$ of the 20 per cent. of the profits, it is fairly to be inferred from the evidence that he knew, or is chargeable with knowledge, of the manner in which the remainder of McDonald's profits was distributed. He and McDonald were personal friends, and it is a reasonable inference that McDonald at least gave to him the same explanation that he gave to Runkle, and that, like Runkle, he accepted it as satisfactory, and thereby approved of the distribution made by McDonald. Moreover, it is to be inferred that plaintiff was familiar with the steps taken subsequently, for he was elected a director of the operating company, and voted for the resolution directing the issuance of 25,000 shares of stock to McDonald and his associates, including himself, and he therefore knew, or was in a position to know, how that stock was issued. The only possible theory, in this view of the case, on which he would be entitled to an accounting, would be with respect to the one-fourth of the five per cent. of the profits which McDonald received back from Belmont; and with respect to that, as already observed, if he did not know, he was in a position to know, that stock for that in-

terest was issued to McDonald. The letter from Belmont to McDonald, promising to give back one-fourth of the 5 per cent., gives rise to the suspicion that McDonald may have received that as part of his share of the profits of this enterprise, and may have concealed it from plaintiff; but it is at most a suspicion, which might have been cleared up by calling Belmont as a witness, for by his testimony it would seem that it could have been shown whether there was an understanding when McDonald assigned the 5 per cent. that he was to receive one-fourth of it back without other consideration. This was not done. Each party saw fit to rest the case on the theory that the burden of proof with respect to this rested on the adverse party.

This may have been a gift from Belmont after the assignment, or it may have rested on other consideration, for which a basis existed, as shown by an agreement on the part of McDonald when he employed Belmont & Co. to finance the enterprise, by which he obligated himself to employ them as his exclusive bankers and financial agents to finance any further construction work for the city undertaken by him during the performance of this contract with the city. This was entirely outside of and beyond the enterprise in question, and McDonald would have had a perfect right to exact for this agreement any consideration he saw fit. I am of opinion that, after this distribution of profits with the apparent acquiescence of all parties in interest, the burden of proof rested on the plaintiff, even if he were entitled to an accounting for undistributed profits, which is the most that he would be entitled to in any event, to show that there remained profits in which he was entitled to share which had not been divided. See Seaward v. Davis, 198 N. Y. 415, 91 N. E. 1107; Ogden v. Astor, 4 Sandf. 311; Campbell v. Campbell, 16 N. Y. Supp. 165; Myer v. Abbett, 105 App. Div. 537, 94 N. Y. Supp. 238, affirmed 186 N. Y. 519, 78 N. E. 1107; Coit v. Goodhart, 5 App. Div. 444, 39 N. Y. Supp. 48; 30 Cyc. 703, 706; see also Corner v. Mackey, 147 N. Y. 574, 42 N. E. 29; Turner v. Kouwenhoven, 100 N. Y. 115, 2 N. E. 637; Uhlman v. N. Y. Life Ins. Co., 109 N. Y. 421, 17 N. E. 363, 4 Am. St. Rep. 482.

It follows that the judgment should be affirmed, with costs. Order filed.

INGRAHAM, P. J., and McLAUGHLIN and DOWLING, JJ., concur.

HOTCHKISS, J. I concur on the first ground, that whatever cause of action plaintiff may have had was one at law and is barred.