MORRIS MAY, Respondent, Appellant, *v.* HETTRICK BROTHERS COMPANY, Appellant, Respondent.

First Department, December 14, 1917.

Partnership — agreement creating joint adventure — agreement to share profits received from sale of goods to foreign government — mutual duties of coadventurers and agents — secret sale made to detriment of coadventurer — liability to account for profits.

Suit to compel the defendant to account for a portion of moneys received by it as profits upon a contract. It appeared that the defendant and the plaintiff's assignor had entered into an agreement whereby, if the assignor

procured for the defendant a contract to manufacture and deliver tents to a foreign government, the assignor was to receive a certain share of the profits, and the defendant further agreed that it would act only through the plaintiff's assignor and would not approach the proposed purchaser in any other way. The assignor having negotiated said sale with an agent of the foreign government and the substantial terms of the sale being settled, except as to a minor detail, the defendant, in violation of its agreement with the assignor, secretly negotiated a sale to the foreign government on its own behalf and furthermore agreed to give to the agent of the foreign government a rebate on the sums received for the tents. Evidence examined, and *held*, to sustain a decree requiring the defendant to account.

The defendant's corrupt agreement to give a rebate to the agent of the foreign government was an act which discredited the testimony of all persons who participated therein.

The defendant and the plaintiff's assignor, although not principal and agent strictly speaking, occupied an analogous relation which required a duty of utmost good faith and required the defendant to refrain from obstructing the négotiations between the assignor and the purchaser.

Copartners, joint adventurers and agents owe the duty of utmost good faith and fidelity to their copartners, coadventurers and principals and they are accountable for any secret profits that they have made whether within or in excess of their authority.

Moreover, until such relationship is terminated a copartner, or joint adventurer, cannot act for himself.

The above rules hold although under the agreement between the defendant and the plaintiff's assignor they were not interested in the same identical portion of the profit.

The defendant should be required to account to the plaintiff on the basis of its proposed contract with the plaintiff's assignor for the difference between the amount it was to receive under that contract and the amount it received under the contract with the purchaser.

SCOTT and DOWLING, JJ., dissented, with opinion.

APPEAL by the defendant, Hettrick Brothers Company, from an interlocutory judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 29th day of June, 1916, upon the decision of the court after a trial at the New York Special Term.

The judgment required the defendant to account to plaintiff for part of the moneys received or to be received by it under a contract in writing, bearing date December 11, 1914, between it and George Panagoulapoulos.

Appeal by the plaintiff, Morris May, from so much of said judgment as limits the scope of the accounting.

*Frederick N. Van Zandt* [*Joseph A. Burdeau* with him on the brief], for the appellant, respondent.

*Benjamin G. Paskus* [*Jacob Scholer* with him on the brief], for the respondent, appellant.

LAUGHLIN, J.:

By the contract defendant agreed to furnish and deliver f. o. b. dock, New York city, 100,000 individual shelter tents intended for the Serbian government. The action is on a claim assigned by the A. B. Kirschbaum Company which I shall refer to as the assignor.

The theory upon which the action was brought and the relief has been awarded is that the assignor and defendant became mutually and jointly interested in obtaining a contract at a specified price per tent from Panagoulapoulos, hereinafter designated the purchaser, running to the assignor, which was to be performed by defendant at a lower specified price per tent, payable from the moneys to be received by the assignor, so that the profits of each were to be separate and distinct; that while negotiations, in which defendant was cooperating pursuant to the agreement, were pending and nearly consummated between the assignor and purchaser, the defendant secretly took up the negotiations and obtained the contract in its own name, and that, therefore, it should account to the assignor to the extent of the interest the assignor was to receive if the contract had been awarded to it. The defendant appellant contends that no agency, copartnership or joint adventure has been shown and that it was within its rights in taking the contract. It also contends that some of the findings unfavorable to it are not supported by evidence or are against the weight of the evidence, and that in any event they do not sustain the interlocutory judgment.

We have examined the evidence and are of opinion that all findings made by the trial court are amply sustained thereby and that other findings more favorable to plaintiff should have been made; but we think that these made are sufficient to sustain the decree for an accounting and, therefore, do not deem it necessary to make additional findings.

The assignor was a Pennsylvania corporation having an office in New York and in Philadelphia and was engaged in manufacturing clothing, including military uniforms.  During the Spanish-American War it manufactured tents for the United States government but discontinued that line of business.  In November, 1914, it sent one Block, a salesman, to Texas to call on the brother of the purchaser, who represented him, with a view to obtaining an order for uniforms; and Block ascertained that the purchaser was desirous of placing an order for 150,000 or more tents and wired the Philadelphia office of his company to that effect.  The assignor thereupon determined to endeavor to obtain the contract for the tents and shortly thereafter opened negotiations with the purchaser to that end, and on the sixteenth of November opened negotiations with the defendant with a view to having it perform the contract if obtained.  Communications on the subject were had between the defendant and the assignor by telegraph, by telephone and by mail and finally the defendant sent a representative to assignor's Philadelphia office where he met and negotiated with its representatives.  It was agreed between them for their mutual protection and profit that in the event the assignor obtained the contract defendant should manufacture and deliver the tents; that they would " tie up " together and that the defendant would make no other connections; and that the defendant would work with and through the assignor only and would not approach or in any manner connect with the purchaser whose name and the negotiations had with him were disclosed to defendant's representatives.  With this understanding they negotiated the terms on which defendant, figuring the cost of manufacture and its own profit, would furnish and deliver the tents and reduce it to writing in the form of a proposal by defendant to the assignor.  That was done to protect the assignor in quoting a price to the purchaser which would include the price to be charged by defendant and the compensation or profit to be received by the assignor.  It was also provided in that proposal that if the assignor should be required to give a bond for performance the defendant would sign with it.  The negotiations between the assignor and purchaser so far progressed that it expected

that it would receive the contract and that the order would be increased by 100,000, and it requested defendant to send on a representative to attend the closing. Pursuant to the request two representatives of the defendant, Tische and Peters, called at the assignor's New York office on November twenty-eighth and were informed that the purchaser had let the contract for the 150,000 tents to another. On that day the representatives of the defendant and the assignor had an interview with the purchaser evidently with a view to ascertaining whether he was desirous of purchasing more tents, and Tische and Peters were introduced to the purchaser by one of the representatives of the assignor as expert tentmakers from its factory. The purchaser stated that he would soon be in the market for 100,000 more tents and it was agreed that the assignor should quote to him a price on them within a few days. Negotiations then followed between the assignor and defendant, owing to the changing market price of material, with respect to the price at which defendant would furnish the tents. During these negotiations defendant wrote to the assignor saying, among other things: " We hope you will be successful in landing this business, and we want to work with you so that WE BOTH get something definite out of it; " and in another letter it said: " We are in this game with you, and hope that we will hear favorably of the acceptance of our proposition." On the eighth of December the assignor notified defendant that it was ready to close the contract and requested that it send on a representative and that it would await his arrival before finally closing the contract. On December tenth Tische and Peters called at the assignor's office in New York where they met Aloe, the secretary and treasurer of the assignor, and May, its second vice-president, and Ellerman, who made estimates for it. The price to be charged by defendant, owing to changes in the dimensions of the tents, had not been agreed upon, but Tische and Ellerman thereupon agreed on a price of one dollar and seventy-four cents per tent. Defendant's representatives produced a sample tent which had a hem on only two sides, and on observing this Aloe stated that he had represented to the purchaser that the tents would have a hem all around. Aloe, May, Tische and Peters then went to the office of the assignor's

First Department, December, 1917.　.　[Vol. 181.

attorney and had contracts prepared for execution between it and defendant and it and the purchaser, and they were approved but not signed. The contracts thus prepared for execution with the purchaser referred to the sample tent as having been exhibited and approved and provided for the delivery of the tents f. o. b. on the dock in New York, boxed for export by delivery to a carrier at the assignor's factory, the place of which was not stated, within fourteen weeks — with a provision for an extension for four weeks longer — after the delivery to the assignor of a guaranty by the Irving National Bank that a sum of money sufficient to cover in full all payments to be made by the purchaser, and that it would pay the assignor on delivery of the bills of lading, and further provided that during the fourteen weeks the assignor should endeavor to make shipments at the rate of approximately 8,000 tents per week after the first four weeks, that deliveries should be deemed made at the factory, that the purchaser should take the risk of delay in transportation and that the assignor should give to the purchaser a surety company bond for $30,000 for performance by it and should receive two dollars per tent. The contract prepared for execution between the assignor and defendant referred to the contract between the assignor and the purchaser and recited that defendant assumed the obligations of the assignor thereunder and would manufacture and deliver the tents in accordance therewith, and should be paid therefor *from the moneys* received *from said bank* one dollar and seventy-four cents for each tent; and that defendant should furnish a bond for $26,000 guaranteeing performance. In the meantime a message by telephone was received from Block, who was with the purchaser at the Knickerbocker Hotel, and Aloe, May, Tische and Peters and Ellerman, who joined them, went there taking the drafts of the contracts with them or arranging to have them sent. On meeting the purchaser Aloe introduced Tische as the assignor's tentmaker. On the sample tent being shown to the purchaser he objected on the ground that the hem was on two sides only and insisted that it should be hemmed all around. This would make a difference in the price of manufacture, according to the testimony of Tische, of eighteen cents per tent. A general discussion then took place between

the parties, the plaintiff's representatives insisting that the contract had been negotiated with reference to the United States shelter tent, which was the sample, and the purchaser insisting that it was to be hemmed all around; and with respect to the additional cost of extending the hem all around. There is also testimony to the effect that the purchaser insisted upon a bond running to the Serbian government and that Aloe appeared to be willing to give such a bond but that May refused so to do. That, however, was controverted, and the testimony produced by the assignor is to the effect that the only objection raised was with respect to the hem and the court so found. The testimony given in behalf of the defendant to the effect that there was a disagreement concerning the bond is quite improbable for the conditions of the bond were only to be for performance by the assignor of its contract to make and deliver to a carrier at the factory and such was the bond subsequently given by defendant. Whether the bond was to run to the purchaser or to the Serbian government, as did the bond given by defendant, was manifestly a matter of no consequence since the obligations were and were to be precisely the same. The testimony adduced on the part of the defendant is to the effect that the negotiations were broken off absolutely; but that adduced in behalf of the assignor, which was accepted by the trial court, is that at the suggestion of Tische, owing to the lateness of the hour, it was agreed that negotiations should be postponed until the next morning when they would be resumed. That interview was at the purchaser's room at the hotel. When the parties were leaving the room they met one Bartell, who had secured the first contract from the purchaser, going in, and Tische expressed fear that Bartell would get the contract and stated, in effect, that the assignor would lose the contract unless it acted promptly. Block called upon the purchaser next morning at the time agreed upon for resuming the negotiations and was informed that he had placed the contract with the defendant the night before. It appears that after the interview with the purchaser on the evening of December tenth, he and Tische and Peters met that night and negotiated a contract for the delivery by the defendant to the purchaser of the same number and class of tents, but hemmed all around,

for which the purchaser agreed to pay two dollars and seventy-five cents per tent, deliveries f. o. b. New York, within twelve weeks from the date of a guaranty to be furnished by the Irving National Bank, to the same effect as that provided for in the draft contract, as aforesaid, and providing that defendant should endeavor to make shipments at the rate of 12,000 tents per week after the lapse of four weeks from the signing of the agreement. The contract contained a provision giving the defendant, in the event of its inability to complete within the time specified, an additional period of six weeks instead of four as provided in said draft contract; and the purchaser agreed to deposit, not as in said draft contract in the Irving National Bank which in said draft contract and in the contract so negotiated that night was to give the guaranty, but in the National Bank of Commerce, a sum sufficient to cover the purchase price, and payments were to be made by the National Bank of Commerce on presentation of bills of lading; and the contract provided that the defendant should give a bond in the sum of $25,000, which was $5,000 less than the assignor had proposed, to the Serbian consul in New York as a guaranty of performance by it. The purchaser and defendant's representatives agreed upon and reduced to writing the terms of the contract that night and completed their negotiations about four o'clock in the morning, but they did not sign the contract. A contract, however, between the purchaser and defendant, under date of December eleventh, was signed by the parties on the fifteenth of December and it followed substantially the terms of the contract negotiated that night with the exception that it provided that the guaranty was to be given by the National Bank of Commerce, with which the money for the purchase of the tents was to be deposited and not by the Irving National Bank. The only testimony in the case is to the effect that the negotiations for the contract made that night between the purchaser and the defendant's representatives were opened by the purchaser. The trial court disbelieved the testimony and found that the negotiations were opened by defendant's representatives, one of whom had taken a room at the hotel. We fully agree with the learned trial justice on this point and are of opinion that the fair inference from the evidence

is, as has been found, in effect, that defendant's representatives sought out and opened negotiations with the purchaser in behalf of defendant, for the purchaser testified that he supposed they were connected with the assignor until they informed him otherwise, when he finding that one of them had taken a room at the hotel called on them. If they went to him knowing that negotiations between him and the assignor were pending and to be resumed in the morning they could not, in the circumstances, take up and conclude the negotiations and give the defendant the contract without liability to the assignor regardless of whether or not they made any misrepresentations fraudulent or otherwise to the purchaser, and if the purchaser called on them to resume the negotiations in which he was led to believe they were representing the assignor, I think they were likewise precluded from taking advantage of their position and of the information acquired to negotiate a contract for defendant. It appears that on the date the final contract was signed between the defendant and the purchaser the defendant gave him a writing by which it agreed on the receipt of two dollars and seventy-five cents for each tent to remit to him or to any one designated by him the difference between the purchase price specified in the contract of two dollars and seventy-five cents and one dollar and ninety-five cents, being eighty cents for each tent, and that there was a parol agreement to the same effect the night the contract was negotiated; but it does not appear at whose suggestion this agreement thus to defraud the Serbian government was made. The making of such an agreement to rob a people already impoverished by famine and war discredited all who participated therein and yet it is repeatedly suggested in defendant's points that the purchaser was a disinterested witness whose testimony should have been accepted.

According to the credible evidence in the case, down to the time that negotiations for making the contract with the purchaser were thus secretly taken by the defendant's representatives out of the hands of the assignor, the defendant had agreed to furnish the tents, with the exception that they were to be hemmed all around instead of on two sides only, for one dollar and seventy-four cents per tent; and the

assignor was to receive the difference between that amount and the price to be paid by the purchaser which it was then expected would be two dollars per tent. The defendant had figured and included its profits in the price of one dollar and seventy-four cents per tent and the assignor for its time, trouble and expense was to receive the difference between that amount and the amount to be paid by the purchaser. The assignor, therefore, might have consented that the extra cost of eighteen cents per tent be taken out of its profits and thus have secured the contract and it would still have had a profit of eight thousand dollars. In view of the fraudulent contract made between the defendant and the purchaser by which the defendant was to give him the secret rebate the trial court evidently was in doubt with respect to whether or not the purchaser was to receive the entire amount of eighty cents per tent or whether he was to share part of it with defendant or its employees, and consequently in the interlocutory judgment it is provided, in effect, not that the defendant shall account to the plaintiff on the basis of one dollar and ninety-five cents per tent, but for the difference between the one dollar and seventy-four cents per tent plus the additional cost caused by any additional requirement in the contract executed between the defendant and the purchaser over and above the requirements of the draft contract, and the amount received or to be received by defendant.

There was here no agency, strictly speaking, but in a sense the defendant, in so far as it took part in the negotiations between the purchaser and the assignor, was acting in a capacity analogous to that of an agent and owed a duty of the utmost good faith and a duty to refrain from obstructing the negotiations between the assignor and the purchaser; and although defendant was not authorized to negotiate the contract for the assignor it was precluded from acting for itself in such manner as to deprive the assignor from obtaining the contract and became accountable to the plaintiff at its election precisely as an agent would have been accountable on the theory that the contract which the defendant thus negotiated with the purchaser is impressed with a trust in favor of the assignor. (*Trice* v. *Comstock,* 121 Fed. Rep. 620; *Patterson* v. *Meyerhofer,* 204 N. Y. 96; *Merrill* v. *Sax,*

141 Iowa, 386; *Marvin* v. *Rogers*, 53 Tex. Civ. App. 423.)
It is a well-settled rule that copartners, joint adventurers and
agents owe the duty of utmost good faith and fidelity to their
copartners, coadventurers and principals and that they are
accountable for any secret profits that they have made whether
within or in excess of their authority. (*Trice* v. *Comstock,
supra; Merrill* v. *Sax, supra; Selwyn & Co.* v. *Waller,* 212 N. Y.
507, revg. 160 App. Div. 725; *Bain* v. *Brown,* 56 N. Y. 285;
*Reis & Co.* v. *Volck,* 151 App. Div. 613; *Mitchell* v. *Reed,*
61 N. Y. 123; *Getty* v. *Devlin,* 54 id. 403.) It is also the
settled law that until the copartnership is terminated or joint
adventure is abandoned a copartner or joint adventurer cannot
act for himself. (*Mitchell* v. *Reed, supra; Parks* v. *Gates,*
84 App. Div. 534.) In *Mitchell* v. *Reed* it was held that a
copartner in taking a renewal lease of premises leased by the
copartnership to take effect not only at the expiration of the
copartnership lease, but also at the termination of the copartner-
ship, would be deemed to hold it as trustee for the firm. It is
sufficient to afford a consideration for an agreement with
respect to a project in the nature of a joint adventure that
services are rendered and it is not essential that money or other
property shall be delivered to a coadventurer to require him
to account. (*Peirce* v. *McDonald,* 168 App. Div. 47, 55;
*Schantz* v. *Oakman,* 163 N. Y. 148, 157.) Here the object of
the joint adventure was the procuring of the contract between
the purchaser and the assignor and both the assignor and the
defendant were jointly interested for the defendant was
thereupon to receive its contract from the assignor. The fact
that they were not interested in the same profit is, I think,
quite immaterial as is also the fact that there might not have
been a right of action by either against the other for an account-
ing had the project succeeded, for then the object of the
joint adventure would have been accomplished and the
profits of each would have been secured by separate agree-
ments; and neither was to receive any profits unless the object
of the joint adventure, namely, the obtaining of a contract
from the purchaser, was accomplished. In legal effect, I
think they were quite as much jointly mutually interested as if
it had been expressly understood and agreed that the con-
tract with the purchaser was to inure directly to the benefit

of both and that the assignor was to have as its share of the profits all received from the purchaser above one dollar and seventy-four cents per tent and the defendant was to receive as its profit the net profits of the manufacture at the price of one dollar and seventy-four cents per tent. That clearly would have constituted a joint adventure in which each was to render services and would have entitled the plaintiff to an accounting on the defendant's violating its duty and taking the contract itself. If we eliminate the difference between the terms of the two contracts and assume that the defendant, knowing that the negotiations were pending with a reasonable prospect of success, secretly opened negotiations with the purchaser and obtained the contract at one dollar and ninety-five cents per tent, thus securing to itself not only its own profit but the profit which the assignor would have received had the contract been made with the assignor on the resumption of negotiations, then, I think, it would also be quite clear under the authorities cited that it would be the duty of the defendant to account to the plaintiff on the basis of its proposed contract with the assignor for the difference between the amount it was to receive under that contract and the amount it received under the contract with the purchaser. If that be so then the case as presented must be governed by the same principle and needs merely the modification provided for in the interlocutory judgment to protect defendant against the additional cost over and above the cost of the material and labor involved in its proposed contract with the assignor. Each of the parties expended much time of its officials and employees and considerable money in the enterprise in which they had agreed to cooperate and I am of opinion that the court is not powerless in the circumstances to prevent the defendant from taking advantage of the confidential relations established between it and the assignor and secretly negotiating the contract for itself. I think it was competent for the court to decree, as it has done in effect, that the assignor was at liberty to claim the benefit of the contract which the defendant made with the purchaser and to require the defendant to account thereunder. This will give the assignor the benefit of the contract as if it had been made between it and the purchaser and will give the defendant the same benefit which

it would have received if it had contracted with the assignor on the basis that it offered to contract so far as that basis is applicable, or, in other words, to the extent that performance is the same under the contract which it made with the purchaser as under the contract which it was willing to make with the assignor. No precedent has been cited or found precisely in point on the facts, but it seems to me that this will be no undue extension of equitable principles. The case is quite analogous to *Patterson* v. *Meyerhofer (supra)*, where it was held that one agreeing to buy from another who did not have title was under an implied agreement not to bid on a foreclosure and thus compete with the other party in obtaining title and prevent his obtaining it.

The plaintiff claims on its appeal that defendant should not be allowed the additional cost of hemming the tents all around and of any other items covered by its contract with the purchaser not embraced in the draft contract which defendant was ready and willing to sign with the assignor. I am of opinion that plaintiff is not entitled to a more favorable judgment. The defendant did not agree to furnish the tents, so far as the requirements differ under the contract which it negotiated with the purchaser from the draft contract, for one dollar and seventy-four cents. Upon no theory was the assignor entitled to participate in defendant's profits for throughout the negotiations defendant and it figured on separate profits. Therefore, to require the defendant to account to the plaintiff on the basis of one dollar and seventy-four cents per tent without any allowance for the additional cost referred to would be to give the plaintiff part of the defendant's profits; but to require the defendant to account, as the interlocutory judgment does, for the difference between one dollar and seventy-four cents per tent plus such additional costs gives the plaintiff the benefit of the contract which the defendant thus secretly negotiated with the purchaser in violation of its duty to the assignor. That is, I think, the only theory upon which the action can be sustained.

It follows, therefore, that the interlocutory judgment should be affirmed, with costs.

CLARKE, P. J., and SMITH, J., concurred; SCOTT and DOWLING, JJ., dissented.

SCOTT, J. (dissenting):

I dissent because I do not consider that any partnership or joint adventure was shown between plaintiff's assignor and defendant. They were not to share profits or losses. Plaintiff's assignor seeing an opportunity to sell a quantity of tents to the Serbian government, and having no facilities for manufacturing such tents itself, sought to obtain from defendant a figure at which the latter would agree to manufacture the tents as subcontractor. This was in order to enable plaintiff's assignor to fix a price for the delivery of the tents to the Serbian government so that it would be assured of a profit. In this profit defendant was to have no share. It was to manufacture the tents at a fixed price which it was to receive in any event, quite irrespective of the profit, if any, plaintiff's assignor might make. I can see none of the elements of a partnership or joint adventure in this arrangement. The defendant's action, as shown by the evidence, was scarcely such as can be considered strictly honorable, but " neither courts of equity or law sit to enforce mere moral obligations." (*Wood* v. *Rabe*, 96 N. Y. 414, 421.) Therefore, no case was made for an accounting in equity.

DOWLING, J., concurred.

Interlocutory judgment affirmed, with costs.